503 U.S. 291 (1992)
UNITED STATES
v.
R. L. C.
No. 90-1577.
United States Supreme Court.
Argued December 10, 1991.
Decided March 24, 1992.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT
*292 *293 Souter, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, IIA, and III, in which Rehnquist, C. J., and White, Stevens, Scalia, Kennedy, and Thomas, JJ., joined, and an opinion with respect to Parts IIB and IIC, in which *294 Rehnquist, C. J., and White and Stevens, JJ., joined. Scalia, J., filed an opinion concurring in part and concurring in the judgment, in which Kennedy and Thomas, JJ., joined, post, p. 307. Thomas, J., filed an opinion concurring in part and concurring in the judgment, post, p. 311.O'Connor, J., filed a dissenting opinion, in which Blackmun, J.,joined, post, p. 312.
Paul J. Larkin, Jr., argued the cause for the United States. With him on the briefs were Solicitor General Starr, Assistant Attorney General Mueller, and Deputy Solicitor General Bryson. 
Katherian D. Roe argued the cause for respondent. With her on the brief were Daniel M. Scott, Scott F. Tilsen, and Andrew H. Mohring. 
Justice Souter announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, IIA, and III, and an opinion with respect to Parts IIB and IIC, in which The Chief Justice, Justice White, and Justice Stevens join.
The provisions of the Juvenile Delinquency Act require the length of official detention in certain circumstances to be limited to "the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult." 18 U. S. C. § 5037(c)(1)(B). We hold that this limitation refers to the maximum sentence that could be imposed if the juvenile were being sentenced after application of the United States Sentencing Guidelines.

I
Early in the morning of November 5, 1989, after a night of drinking, the then-16-year-old respondent R. L. C. and another juvenile stole a car with which they struck another automobile, fatally injuring one of its passengers, 2-year-old La Tesha Mountain. R. L. C. is a member of the Red Lake Band of Chippewa Indians, and these events took place on the Red Lake Indian Reservation, which is within Indian *295 country as defined by federal law. These circumstances provide federal jurisdiction in this case. See 18 U. S. C. §§ 1151, 1162, 1153. Upon certifying that a proceeding was authorized in federal court under § 5032 on the ground that no state court had jurisdiction over the offense, the Government charged R. L. C. with an act of juvenile delinquency.
After a bench trial, the District Court found R. L. C. to be a juvenile who had driven a car recklessly while intoxicated and without the owner's authorization, causing Mountain's death. R. L. C. was held to have committed an act of juvenile delinquency within the meaning of § 5031, since his acts would have been the crime of involuntary manslaughter in violation of §§ 1112(a) and 1153 if committed by an adult. The maximum sentence for involuntary manslaughter under 18 U. S. C. § 1112(b) is three years. At R. L. C.'s dispositional hearing, the District Court granted the Government's request to impose the maximum penalty for respondent's delinquency and accordingly committed him to official detention for three years.
Despite the manslaughter statute's provision for an adult sentence of that length, the United States Court of Appeals for the Eighth Circuit vacated R. L. C.'s sentence and remanded for resentencing, after concluding that 36 months exceeded the cap imposed by § 5037(c)(1)(B) upon the period of detention to which a juvenile delinquent may be sentenced. 915 F. 2d 320 (1990). Although the statute merely provides that juvenile detention may not extend beyond "the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult,"[1] the *296 Court of Appeals read this language to bar a juvenile term longer than the sentence a court could have imposed on a similarly situated adult after applying the United States Sentencing Guidelines. Under the Guidelines, involuntary manslaughter caused by recklessness has a base offense level of 14. United States Sentencing Commission, Guidelines Manual § 2A1.4(a)(2) (Nov. 1991). The court found, and the Government agrees, see Brief for United States 22, n. 5, that because R. L. C. had the lowest possible criminal history level, Category I, the Guidelines would yield a sentencing range of 15-21 months for a similarly situated adult. The Court of Appeals therefore concluded that the maximum period of detention to which R. L. C. could be sentenced was 21 months.
The Government sought no stay of mandate from the Court of Appeals, and on remand the District Court imposed detention for 18 months. Although R. L. C. has now served this time, his failure to complete the 3-year detention originally imposed and the possibility that the remainder of it could be imposed saves the case from mootness. See United States v. Villamonte-Marquez, 462 U. S. 579, 581, n. 2 (1983). We granted the Government's petition for certiorari, 501 U. S. 1230 (1991), to resolve the conflict between the Eighth Circuit's holding in this case and the Ninth Circuit's position, adopted in United States v. Marco L., 868 F. 2d 1121, *297 cert. denied, 493 U. S. 956 (1989), and endorsed by the Government.

II

A
The Government suggests a straightforward enquiry into plain meaning to explain what is "authorized." It argues that the word "authorized" must mean the maximum term of imprisonment provided for by the statute defining the offense, since only Congress can "authorize" a term of imprisonment in punishment for a crime. As against the position that the Sentencing Guidelines now circumscribe a trial court's authority, the Government insists that our concern must be with the affirmative authority for imposing a sentence, which necessarily stems from statutory law. It maintains that in any event the Sentencing Commission's congressional authorization to establish sentencing guidelines does not create affirmative authority to set punishments for crime, and that the Guidelines do not purport to authorize the punishments to which they relate.
But this is too easy. The answer to any suggestion that the statutory character of a specific penalty provision gives it primacy over administrative sentencing guidelines is that the mandate to apply the Guidelines is itself statutory. See 18 U. S. C. § 3553(b). More significantly, the Government's argument that "authorization" refers only to what is affirmatively provided by penal statutes, without reference to the Sentencing Guidelines to be applied under statutory mandate, seems to us to beg the question. Of course it is true that no penalty would be "authorized" without a statute providing specifically for the penal consequences of defined criminal activity. The question, however, is whether Congress intended the courts to treat the upper limit of such a penalty as "authorized" even when proper application of a statutorily mandated Guideline in an adult case would bar imposition up to the limit, and an unwarranted upward departure *298 from the proper Guideline range would be reversible error. § 3742. Here it suffices to say that the Government's construction is by no means plain. The text is at least equally consistent with treating "authorized" to refer to the result of applying all statutes with a required bearing on the sentencing decision, including not only those that empower the court to sentence but those that limit the legitimacy of its exercise of that power. This, indeed, is arguably the more natural construction.
Plain-meaning analysis does not, then, provide the Government with a favorable answer. The most that can be said from examining the text in its present form is that the Government may claim its preferred construction to be one possible resolution of statutory ambiguity.

B
On the assumption that ambiguity exists, we turn to examine the textual evolution of the limitation in question and the legislative history that may explain or elucidate it.[2] The *299 predecessor of § 5037(c) as included in the Juvenile Justice and Delinquency Prevention Act of 1974 provided that a juvenile adjudged delinquent could be committed to the custody of the Attorney General for a period "not [to]extend beyond the juvenile's twenty-first birthday or the maximum term which could have been imposed on an adult convicted of the same offense, whichever is sooner." 18 U. S. C. § 5037(b) (1982 ed.) (emphasis added). In its current form, the statute refers to the "maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult." 18 U. S. C. § 5037(c) (emphasis added). On its face, the current language suggests a change in reference from abstract consideration of the penalty permitted in punishment of the adult offense, to a focused enquiry into the maximum that would be available in the circumstances of the particular juvenile before the court. The intervening history supports this reading.
With the Sentencing Reform Act of 1984 (chapter II of the Comprehensive Crime Control Act of 1984, Pub. L. 98 473, § 214(a), 98 Stat. ), § 5037 was rewritten. As § 5037(c)(1)(B), its relevant provision became "the maximum term of imprisonment that would be authorized by section 3581(b) if the juvenile had been tried and convicted as an adult." 18 U. S. C. §§ 5037(c)(1)(B), (c)(2)(B)(ii) (1982 ed., Supp. II) (emphasis added). The emphasized language was quickly deleted, however, by the Criminal Law and Procedure Technical Amendments Act of 1986, Pub. L. 99-646, § 21(a)(2), 100 Stat. 3596 (Technical Amendments Act), resulting in the present statutory text, "the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult." It thus lost the reference to § 3581(b), which would have guided the sentencing court in identifying the "authorized" term of imprisonment.
*300 R. L. C. argues that this loss is highly significant. Section 3581(b)[3] was, and still is, part of a classification system adopted in 1984 for use in setting the incidents of punishment for federal offenses by reference to letter grades reflecting their relative seriousness. One provision, for example, sets the maximum period of supervised release for each letter grade. § 3583. Section 3581(b) sets out the maximum term of imprisonment for each letter grade, providing, for instance, that the authorized term of imprisonment for a class C felony is not more than 12 years, for a class D not more than 6, and for a class E not more than 3.
The deletion of the reference to § 3581(b) with its specific catalog of statutory maximums would seem to go against the Government's position. Since, for example, a juvenile who had committed what would have been an adult class E felony would apparently have been subject to three years of detention, because § 3581(b) "authorized" up to three years of imprisonment for an adult, the deletion of the reference to § 3581(b) would appear to indicate some congressional intent to broaden the range of enquiry when determining what was authorized.[4]
The Government, however, finds a different purpose, disclosed in the section-by-section analysis prepared by the Department *301 of Justice to accompany the bill that became the Technical Amendments Act. The Department's analysis included this explanation for the proposal to delete the reference to § 3581(b): "Because of the effect of 18 U. S. C. § 3559(b)(2), deleting the reference to 18 U. S. C. § 3581(b) will tie the maximum sentences for juveniles to the maximum for adults, rather than making juvenile sentences more severe than adult sentences." 131 Cong. Rec. 14177 (1985). Congress had enacted § 3559 to reconcile the new sentencing schedule, providing for the incidents of conviction according to the offense's assigned letter grade, with the pre-existing body of federal criminal statutes, which of course included no assignments of letter grades to the particular offenses they created. Section 3559(a) provides a formula for assigning the missing letter based on the maximum term of imprisonment set by the statute creating the offense. Thus, as it stood at the time of the Technical Amendments Act, it read:
"(a) Classification
"An offense that is not specifically classified by a letter grade in the section defining it, is classified
"(1) if the maximum term of imprisonment authorized is
"(A) life imprisonment, or if the maximum penalty is death, as a Class A felony;
"(B) twenty years or more, as a Class B felony;
"(C) less than twenty years but ten or more years, as a Class C felony;
"(D) less than ten years but five or more years, as a Class D felony;
"(E) less than five years but more than one year, as a Class E felony;
"(F) one year or less but more than six months, as a Class A misdemeanor;
"(G) six months or less but more than thirty days, as a Class B misdemeanor;

*302 "(H) thirty days or less but more than five days, as a Class C misdemeanor; or
"(I) five days or less, or if no imprisonment is authorized, as an infraction.
"(b) Effect of classification
"An offense classified under subsection (a) carries all the incidents assigned to the applicable letter designation except that:
"(1) the maximum fine that may be imposed is the fine authorized by the statute describing the offense, or by this chapter, whichever is the greater; and
"(2) the maximum term of imprisonment is the term authorized by the statute describing the offense." 18 U. S. C. § 3559 (1982 ed., Supp. II).
The Government explains that limiting the length of a juvenile detention to that authorized for an adult under § 3581(b) could in some circumstances have appeared to authorize a longer sentence than an adult could have received, when the offense involved was assigned no letter grade in its defining statute. Thus an offense created without letter grade and carrying a maximum term of two years would be treated under § 3559(a) as a class E felony. Section 3581(b) provides that a class E felony carried a maximum of three years. Regardless of that classification, § 3559(b)(2) would certainly preclude sentencing any adult offender to more than two years. Tension would arise, however, where a juvenile had committed the act constituting the offense. Insofar as § 5037(c) capped the juvenile detention by reference to what was authorized for an adult, the maximum would have been two years; but insofar as it capped it by reference to what was authorized by § 3581(b), the limit might have appeared to be three. It was to break this tension, according to the Government, that the reference to § 3581(b) was deleted guaranteeing that no juvenile would be given detention longer than the maximum adult sentence authorized by the *303 statute creating the offense. The amendment also, the Government says, left the law clear in its reference to the statute creating the offense as the measure of an "authorized" sentence. This conclusion is said to be confirmed by a statement in the House Report that the amendment "delet[es an] incorrect cross-referenc[e]," H. R. Rep. No. 99-797, p. 21 (1986), which, the Government argues, "suggests that no substantive change was intended." Brief for United States 20, n. 4.
We agree with the Government's argument up to a point. A sentencing court could certainly have been confused by the reference to § 3581(b). A sentencing judge considering a juvenile defendant charged with an offense bearing no letter classification, and told to look for "the maximum term of imprisonment that would be authorized [according to letter grade] by section 3581(b)," would have turned first to § 3559(a) to obtain a letter classification. The court perhaps would have felt obliged to ignore the provision of § 3559(b) that "the maximum term of imprisonment is the term authorized by the statute describing the offense" in favor of a longer term provided for by the appropriate letter grade in § 3581(b). Indeed, the sentencing judge would have been faced with this puzzle in virtually every case, since the system of classifying by letter grades adopted in 1984 was only to be used in future legislation defining federal criminal offenses. See Brief for United States 16. No federal offense on the books at the time the Sentencing Reform Act of 1984 was adopted carried a letter grade in its defining statute, and Congress has used the device only rarely in the ensuing years.
Thus, while it included a reference to § 3581(b), § 5037(c) was ambiguous. This ambiguity was resolved by an amendment that, absent promulgation of the Guidelines, might have left the question of the "authorized" maximum term of imprisonment to be determined only by reference to the penalty provided by the statute creating the offense, whether *304 expressed as a term of years or simply by reference to letter grade. The legislative history does not prove, however, that Congress intended "authorized" to refer solely to the statute defining the offense despite the enactment of a statute requiring application of the Sentencing Guidelines, a provision that will generally provide a ceiling more favorable to the juvenile than that contained in the offense-defining statute.
Indeed, the contrary intent would seem the better inference. The Justice Department analysis of the Criminal Law and Procedure Technical Amendments Act of 1986, upon which the Government relies, went on to say that "deleting the reference to 18 U. S. C. § 3581(b) will tie the maximum sentences for juveniles to the maximum for adults, rather than making juvenile sentences more severe than adult sentences." 131 Cong. Rec. 14177 (1985). This is an expression of purpose that today can be achieved only by reading "authorized" to refer to the maximum period of imprisonment that may be imposed consistently with 18 U. S. C. § 3553(b). That statute provides that "[t]he court shall impose a sentence . . . within the range" established for the category of offense as set forth in the Guidelines, "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." § 3553(b).
The point is reinforced by other elements of the legislative history. The Senate Report accompanying the 1986 Technical Amendments Act states that the amendment "makes clear that juvenile sentences are to be of equal length as those for adult offenders committing the same crime." S. Rep. No. 99-278, p. 3 (1986). This, in turn, reflects the statement in the Senate Report accompanying the Sentencing Reform Act, that the changes in juvenile sentencing law were included "in order to conform it to the changes made in adult sentencing laws." S. Rep. No. 98-225, p. 155 (1983). *305 The most fundamental of the Sentencing Reform Act's changes was, of course, the creation of the Sentencing Commission, authorized to promulgate the guidelines required for use by sentencing courts. It hardly seems likely that Congress adopted the current § 5037(c) with a purpose to conform juvenile and adult maximum sentences without intending the recently authorized Guidelines scheme to be considered for that purpose. The legislative history thus reinforces our initial conclusion that § 5037 is better understood to refer to the maximum sentence permitted under the statute requiring application of the Guidelines.[5]

C
We do not think any ambiguity survives. If any did, however, we would choose the construction yielding the shorter sentence by resting on the venerable rule of lenity, see, e. g., United States v. Bass, 404 U. S. 336, 347-348 (1971), rooted in "`the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should,' " id., at 348 (quoting H. Friendly, Benchmarks 209 (1967)). While the rule has been applied not only to resolve issues about the substantive scope of criminal statutes, but to answer questions about the severity of sentencing, see Bifulco v. United States, 447 U. S. 381, 387 (1980), its application is unnecessary in this case, since "we have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to `the language and structure, legislative history, and motivating policies' of the *306 statute." Moskal v. United States, 498 U. S. 103, 108 (1990) (citation omitted).[6]

III
We hold, therefore, that application of the language in § 5037(c)(1)(B) permitting detention for a period not to exceed "the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult" refers to the maximum length of sentence to which a similarly situated adult would be subject if convicted of the adult counterpart of the offense and sentenced under the statute requiring application of the Guidelines, § 3553(b). Although determining the maximum permissible sentence under § 5037(c)(1)(B) will therefore require sentencing and reviewing courts to determine an appropriate Guideline range in juvenile-delinquency proceedings, we emphasize *307 that it does not require plenary application of the Guidelines to juvenile delinquents.[7] Where that statutory provision applies, a sentencing court's concern with the Guidelines goes solely to the upper limit of the proper Guideline range as setting the maximum term for which a juvenile may be committed to official detention, absent circumstances that would warrant departure under § 3553(b).
The judgment of the Court of Appeals is
Affirmed. 
Justice Scalia, with whom Justice Kennedy and Justice Thomas join, concurring in part and concurring in the judgment.
In my view it is not consistent with the rule of lenity to construe a textually ambiguous penal statute against a criminal defendant on the basis of legislative history. Because Justice Souter's opinion assumes the contrary, I join only Parts I, IIA, and III, and concur in the judgment.
The Court begins its analysis, quite properly, by examining the language of 18 U. S. C. § 5037(c)(1)(B)which proves to be ambiguous. Reasonable doubt remains, the Court concludes, as to whether the provision refers (i) to the maximum punishment that could be imposed if the juvenile were being sentenced under the United States Sentencing Guidelines (15-21 months) or (ii) to the maximum punishment authorized by the statute defining the offense, see 18 U. S. C. § 1112(a) (36 months). Ante, at 298. With that conclusion I agreeand that conclusion should end the matter. The rule of lenity, in my view, prescribes the result when a criminal *308 statute is ambiguous: The more lenient interpretation must prevail.
Yet the plurality continues. Armed with its warrant of textual ambiguity, the plurality conducts a search of § 5037's legislative history to determine whether that clarifies the statute. Happily for this defendant, the plurality's extra textual inquiry is benign: It uncovers evidence that the "better understood" reading of § 5037 is the more lenient one. Ante, at 305. But this methodology contemplates as well a different ending, one in which something said in a Committee Report causes the criminal law to be stricter than the text of the law displays. According to the plurality, "`[W]e have always reserved [the rule of] lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to "the language and structure, legislative history, and motivating policies" of the statute.' " Ante, at 305-306 (quoting Moskal v. United States, 498 U. S. 103, 108 (1990) (citation omitted)). I doubt that Moskal accurately characterizes the law in this area, and I am certain that its treatment of "the venerable rule of lenity," ante, at 305, does not venerate the important values the old rule serves.
The Moskal formulation of the rule, in approving reliance on a statute's "motivating policies" (an obscure phrase), seems contrary to our statement in Hughey v. United States, 495 U. S. 411, 422 (1990), that "[e]ven [where] the statutory language . . . [is] ambiguous, longstanding principles of lenity. . . preclude our resolution of the ambiguity against [the criminal defendant] on the basis of general declarations of policy in the statute and legislative history." And insofar as Moskal requires consideration of legislative history at all, it compromises what we have described to be purposes of the lenity rule. "[A] fair warning," we have said, "should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line *309 should be clear." McBoyle v. United States, 283 U. S. 25, 27 (1931). "[T]he rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal." Liparota v. United States, 471 U. S. 419, 427 (1985). It may well be true that in most cases the proposition that the words of the United States Code or the Statutes at Large give adequate notice to the citizen is something of a fiction, see McBoyle, supra, at 27, albeit one required in any system of law; but necessary fiction descends to needless farce when the public is charged even with knowledge of Committee Reports.
Moskal `s mode of analysis also disserves the rule of lenity's other purpose: assuring that the society, through its representatives, has genuinely called for the punishment to be meted out. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." United States v. Bass, 404 U. S. 336, 348 (1971). See also Liparota, supra, at 427; United States v. Wiltberger, 5 Wheat. 76, 95 (1820). The rule reflects, as the plurality acknowledges, "` "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should."` " Ante, at 305 (quoting Bass, supra, at 348, and H. Friendly, Benchmarks 209 (1967)). But legislative history can never provide assurance against that unacceptable result. After all, "[a] statute is a statute," ante, at 305, n. 5, and no matter how "authoritative" the history may beeven if it is that veritable Rosetta Stone of legislative archaeology, a crystal clear Committee Reportone can never be sure that the legislators who voted for the text of the bill were aware of it. The only thing that was authoritatively adopted for sure was the text of the enactment; the rest is necessarily speculation. Where it is doubtful whether the text includes the penalty, the penalty ought not be imposed. "[T]he moral condemnation of the community," Bass, supra, at 348, is no more reflected *310 in the views of a majority of a single committee of congressmen (assuming, of course, they have genuinely considered what their staff has produced) than it is reflected in the views of a majority of an appellate court; we should feel no less concerned about "men languishing in prison" at the direction of the one than of the other.
We have in a number of cases other than Moskal done what the plurality has done here: inquired into legislative history and invoked it to support or at least permit the more lenient reading. But only once, to my knowledge, have we relied on legislative history to "clarify" a statute, explicitly found to be facially ambiguous, against the interest of a criminal defendant. In Dixson v. United States, 465 U. S. 482, 500-501, n. 19 (1984), the Court relied on legislative history to determine that defendants, officers of a corporation responsible for administering federal block grants, were "public officials" within the meaning of 18 U. S. C. § 201(a). The opinion does not trouble to discuss the "fair warning" or "condemnation of the community" implications of its decision, and both of the cases it cites in supposed support of its holding found the statute at hand not to be facially ambiguous. See United States v. Moore, 423 U. S. 122, 131 (1975) ("By its terms § 841 reaches `any person' " and "does not exempt (as it could have) `all registrants' or `all persons registered under this Act' "); United States v. Brown, 333 U. S. 18, 22 (1948) ("The legislation reflects an unmistakable intention to provide punishment for escape or attempted escape to be superimposed upon the punishment meted out for previous offenses. This appears from the face of the statute itself"). I think Dixson weak (indeed, utterly unreasoned) foundation for a rule of construction that permits legislative history to satisfy the ancient requirement that criminal statutes speak "plainly and unmistakably," United States v. Gradwell, 243 U. S. 476, 485 (1917); see also Bass, supra, at 348.
In sum, I would not embrace, as the plurality does, the Moskal formulation of this canon of construction, lest lower *311 courts take the dictum to heart. I would acknowledge the tension in our precedents, the absence of an examination of the consequences of the Moskal mode of analysis, and the consequent conclusion that Moskal may not be good law.
Justice Thomas, concurring in part and concurring in the judgment.
I agree with Justice Scalia that the use of legislative history to construe an otherwise ambiguous penal statute against a criminal defendant is difficult to reconcile with the rule of lenity. I write separately, however, to emphasize that the rule is not triggered merely because a statute appears textually ambiguous on its face. Just last Term, we reaffirmed that the rule operates only "`at the end of the process' " of construction, Chapman v. United States, 500 U. S. 453, 463 (1991) (quoting Callanan v. United States, 364 U. S. 587, 596 (1961)), if ambiguity remains "even after a court has "`seize[d] every thing from which aid can be derived,"` " ibid. (quoting United States v. Bass, 404 U. S. 336, 347 (1971), in turn quoting United States v. Fisher, 2 Cranch 358, 386 (1805)). Thus, although we require Congress to enact "clear and definite" penal statutes, United States v. Universal C. I. T. Credit Corp., 344 U. S. 218, 221-222 (1952), we also consult our own "well-established principles of statutory construction," Gozlon-Peretz v. United States, 498 U. S. 395, 410 (1991), in determining whether the relevant text is clear and definite. See, e. g., id., at 404 (applying the rule in Arnold v. United States, 9 Cranch 104, 119-120 (1815), that statutes become effective immediately); Albernaz v. United States, 450 U. S. 333, 337-342 (1981) (applying the rule in Blockburger v. United States, 284 U. S. 299, 304 (1932), to establish the permissibility of multiple punishments).
These cases, I think, demonstrate that we must presume familiarity not only with the United States Code, see ante, at 309, but also with the United States Reports, in which we have developed innumerable rules of construction powerful *312 enough to make clear an otherwise ambiguous penal statute. Cf. Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843, n. 9 (1984) ("clear congressional intent" may be discerned by application of "traditional tools of statutory construction"). Like Congress' statutes, the decisions of this Court are law, the knowledge of which we have always imputed to the citizenry. At issue here, though, is a rule that would also require knowledge of committee reports and floor statements, which are not law. I agree with Justice Scalia that there appears scant justification for extending the "necessary fiction" that citizens know the law, see ante, at 309, to such extra legal materials.
Justice O'Connor, with whom Justice Blackmun joins, dissenting.
By failing to interpret 18 U. S. C. § 5037(c)(1)(B) in light of the statutory scheme of which it is a part, the Court interprets a "technical amendment" to make sweeping changes to the process and focus of juvenile sentencing. Instead, the Court should honor Congress' clear intention to leave settled practice in juvenile sentencing undisturbed.
When Congress enacted the Sentencing Reform Act of 1984, it authorized the United States Sentencing Commission (Sentencing Commission or Commission) to overhaul the discretionary system of adult sentencing. As an important aspect of this overhaul, Guidelines sentencing formalizes sentencing procedures. The Commission explains:
"In pre-guidelines practice, factors relevant to sen- tencing were often determined in an informal fashion. The informality was to some extent explained by the fact that particular offense and offender characteristics rarely had a highly specific or required sentencing con- sequence. This situation will no longer exist under sentencing guidelines. The court's resolution of dis- puted sentencing factors will usually have a measura- ble effect on the applicable punishment. More formal- *313 ity is therefore unavoidable if the sentencing process is to be accurate and fair. " United States Sentencing Commission, Guidelines Manual § 6A1.3, comment (Nov. 1991) (USSG).
Another significant change permits an appeal when the Guidelines are incorrectly applied or departed from, 18 U. S. C. § 3742; under prior law, a sentence within statutory limits was not generally subject to review, United States v. Tucker, 404 U. S. 443, 447 (1972). Thus, factual findings made at adult sentencing hearings can be challenged on appeal.
When Congress made these fundamental changes in sentencing, it repealed the Youth Corrections Act, Pub. L. 98 473, Title II, § 218(a)(8), 98 Stat. 2027 (1984), which gave special treatment to defendants under 22. Congress did not, however, repeal the Juvenile Delinquency Act, which applies to defendants under 18, and clearly indicated that the Commission was only to study the feasibility of sentencing guidelines for juveniles, see 28 U. S. C. §§ 995(a)(1)(a)(9), a process which is still in progress. Brief for United States 11, n. 1. Thus, Congress did not intend the Guidelines to apply to juveniles. Section 5037(c)(1)(B) must be interpreted against this backdrop.
Before the Sentencing Reform Act, § 5037(c)(1)(B) limited juvenile sentences by the correlative adult statutory maximum. As part of the Sentencing Reform Act, Congress made clear that this past practice would remain the same by limiting juvenile sentences to: "the maximum term of imprisonment that would be authorized by section 3581(b) if the juvenile had been tried and convicted as an adult," 18 U. S. C. § 5037(c)(1)(B) (1982 ed., Supp. II) (emphasis added). The reference to § 3581(b), which classifies offenses and sets out maximum terms, clarified that the statutory maximum of the offense, not the Guideline maximum, would still limit the juvenile's sentence. Thus, consonant with its decision to leave juvenile sentencing in place, Congress did not change *314 § 5037(c)(1)(B) to require sentencing judges in juvenile cases to calculate Guideline maximum sentences.
As the plurality acknowledges, ante, at 299-304, the crossreference to § 3581(b) added by the Sentencing Reform Act created a new ambiguity as to whether the maximum sentence referred to was that authorized in the particular offense statute, or in the offense classification statute. To resolve the ambiguity, the cross-reference was deleted in 1986 as one of numerous technical amendments. The Court reads this technical amendment as changing § 3581's reference from the statutory maximum to the Guideline maximum, even though before the amendment the statute clearly did not refer to the Guideline maximum. While the original version of § 5037(c)(1)(B) was ambiguous in other respects, there was never any question that § 5037(c)(1)(B) referred to the adult statutory maximum. There is no indication that Congress intended to change pre-existing practice. Section 5037(c) (1)(B), read in this context, still unambiguously refers to the statutory maximum. And because § 5037(c)(1)(B) is unambiguous in this respect, the rule of lenity does not apply here. Moskal v. United States, 498 U. S. 103, 108 (1990) (Court may look to structure of statute to ascertain the sense of a provision before resorting to rule of lenity). The Court, however, construes § 5037(c)(1)(B) to change pre-existing practice only by reading it in a vacuum apart from the rest of the Sentencing Reform Act, thus violating the canon of construction that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Michigan Dept. of Treasury, 489 U. S. 803, 809 (1989).
The practical implications of the Court's reading demonstrate why its construction runs contrary to Congress' decision not to apply the Guidelines to juveniles. Requiring a district court to calculate a Guideline maximum for each juvenile imports formal factfinding procedures foreign to the discretionary sentencing system Congress intended to retain. *315 Juvenile proceedings, in contrast to adult proceedings, have traditionally aspired to be "intimate, informal [and] protective." McKeiver v. Pennsylvania, 403 U. S. 528, 545 (1971). One reason for the traditional informality of juvenile proceedings is that the focus of sentencing is on treatment, not punishment. The presumption is that juveniles are still teachable and not yet "hardened criminals." S. Rep. No. 1989, 75th Cong., 3d Sess., 1 (1938). See McKeiver, supra; 18 U. S. C. § 5039 ("Whenever possible, the Attorney General shall commit a juvenile to a foster home or community-based facility located in or near his home community"). As a result, the sentencing considerations relevant to juveniles are far different from those relevant to adults.
The Court asserts, naively it seems to me, that it is not requiring "plenary application" of the Guidelines, ante, at 307, and makes the process of determining the Guideline maximum seem easya court need only look at the offense the juvenile was found guilty of violating and his criminal history, ante, at 296. In practice, however, calculating a Guideline maximum is much more complicated. Even in this relatively straightforward case, respondent was said to have stolen the car he was driving. Although apparently not placed in issue at the sentencing hearing, that conduct might, if proven and connected to the offense of which respondent was convicted, enhance the applicable Guideline maximum as "relevant conduct." See USSG § 1B1.3. Respondent's role in the offense might also warrant an adjustment of the Guideline maximum. §§ 3B1.1, 3B1.2. The District Court made a determination that respondent had not accepted responsibility, and that finding changed the calculation of the Guideline maximum. Tr. 3 (Jan. 25, 1991), § 3E1.1. The District Court also had to take into account factors not considered by the Guidelines in determining whether or not a departure was warranted, which would increase or decrease the "maximum" sentence by an undiscernible "reasonable" amount. Tr. 3-4, 18 U. S. C. § 3553(b). In short, the Guideline *316 maximum is not static or readily ascertainable, but depends on particularized findings of fact and discretionary determinations made by the sentencing judge.
These determinations may even require adversarial evidentiary hearings. Yet such formal factual investigations are not provided for by the Juvenile Delinquency Act. There is no indication in the statute that the judge is required to support the sentence with particular findings. USSG § 6A1.3 and Federal Rule of Criminal Procedure 32(a)(1), as amended after the Guidelines, do provide for an adversarial sentencing procedure for adults that accommodates Guideline factfinding. Rule 32 does not apply when it conflicts with provisions of the Juvenile Delinquency Act, however, see Fed. Rule Crim. Proc. 54(b)(5), and it seems to me a serious question whether adversarial factfinding is what Congress had in mind for juvenile sentencing. An even more serious question is whether Congress intended juveniles to be able to appeal the findings of fact that determine the Guideline maximum. Yet the Court's decision would seem to require provision for such appeals.
In addition, a Guideline maximum for an adult incorporates factors the Sentencing Commission has found irrelevant to juvenile sentencing, see, e. g., USSG § 4B1.1 (career offender status inapplicable to defendants under 18), and does not incorporate factors Congress has found relevant to juvenile sentencing, see, e. g., USSG §§ 5H1.1, 5H1.6 (age and family ties irrelevant to Guideline sentencing). As a result, the Guideline maximum for an adult cannot serve as a useful point of comparison. In sum, the cumbersome process of determining a comparable Guideline maximum threatens to dominate the juvenile sentencing hearing at the expense of considerations more relevant to juveniles.
I cannot infer that Congress meant to overhaul and refocus the procedures of juvenile sentencing in such a fundamental way merely by deleting a cross-reference in a technical amendment, especially when Congress expressly left juvenile *317 sentencing out of the scope of the Sentencing Reform Act and directed the Commission to examine how sentencing guidelines might be tailored to juveniles.
This case is admittedly unusual in that respondent was sentenced to a longer sentence than a similarly situated adult. Before the Guidelines were enacted, however, such anomalies were not unknown: A juvenile could receive a longer sentence than a similarly situated adult, as long as the sentence was within the statutory maximum. We should not try to address the disparity presented in this particular case by changing all juvenile sentencing in ways that Congress did not intend. Instead, we should wait for the Sentencing Commission and Congress to decide whether to fashion appropriate guidelines for juveniles. For this reason, I respectfully dissent.
NOTES
[1] Title 18 U. S. C. § 5037(c) provides:

"(c) The term for which official detention may be ordered for a juvenile found to be a juvenile delinquent may not extend
"(1) in the case of a juvenile who is less than eighteen years old, beyond the lesser of
"(A) the date when the juvenile becomes twenty-one years old; or
"(B) the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult; or
"(2) in the case of a juvenile who is between eighteen and twenty-one years old
"(A) who if convicted as an adult would be convicted of a Class A, B, or C felony, beyond five years; or
"(B) in any other case beyond the lesser of
"(i) three years; or
"(ii)the maximum term of imprisonment that would be authorized if the juvenile had been tried and convicted as an adult."
[2] R. L. C. argues that the broader statutory purpose supports his position. He contends that longer juvenile sentences are only justified by a rehabilitative purpose. See, e. g., Carter v. United States, 113 U. S. App. D. C. 123, 125, 306 F. 2d 283, 285 (1962) (imposing a longer juvenile sentence under the now-repealed Youth Corrections Act) ("[R]ehabilitation may be regarded as comprising the quid pro quo for a longer confinement but under different conditions and terms than a defendant would undergo in an ordinary prison"). He then suggests that the Sentencing Reform Act rejected the rehabilitative model not merely for adult imprisonment, see Mistretta v. United States, 488 U. S. 361, 366-367 (1989), but for juveniles as well. See Brief for Respondent 19. While it is true that some rehabilitative tools were removed from the juvenile penalty scheme in 1984, see Pub. L. 98-473, § 214(b), 98 Stat.  (abolishing parole for juvenile delinquents), the Juvenile Delinquency Act does not completely reject rehabilitative objectives. See, e. g., 18 U. S. C. §§ 5035, 5039. We do not think a broader congressional purpose points clearly in either party's direction.
[3] "(b)Authorized terms.The authorized terms of imprisonment are

"(1) for a Class A felony,the duration of the defendant's life or any period of time;
"(2) for a Class B felony, not more than twenty-five years;
"(3) for a Class C felony, not more than twelve years;
"(4) for a Class D felony, not more than six years;
"(5) for a Class E felony, not more than three years;
"(6) for a Class A misdemeanor, not more than one year;
"(7) for a Class B misdemeanor, not more than six months;
"(8) for a Class C misdemeanor, not more than thirty days; and
"(9) for an infraction, not more than five days." 18U. S. C. § 3581.
[4] We speak here of an indication appearing solely from the face of the text. In fact, so far as we can tell, at the time of the amendment no federal statute defining an offense referred to it by letter grade.
[5] The dissent takes us to task for reliance upon a "technical amendment." But a statute is a statute, whatever its label. Although the critical congressional enactment, the deletion of the reference to § 3581(b),came in the Technical Amendments Act, we have applied the usual tools of statutory construction: the language left in the statute after its amendment in 1986 is most naturally read to refer to the term of imprisonment authorized after application of the statute mandating use of the Guidelines. The legislative history of the Technical Amendments Act reinforces this conclusion.
[6] Justice Scalia questions the soundness of Moskal `s statement that we have reserved lenity for those cases (unlike this one) in which after examining "the . . . structure, legislative history, and motivating policies," in addition to the text of an ambiguous criminal statute, we are still left with a reasonable doubt about the intended scope of the statute's application. But the Court has not in the past approached the use of lenity in the way Justice Scalia would have it.

It is true that the need for fair warning will make it "rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text," Crandon v. United States, 494 U. S. 152, 160 (1990), and that "general declarations of policy," whether in the text or the legislative history, will not support construction of an ambiguous criminal statute against the defendant, Hughey v. United States, 495 U. S. 411, 422 (1990). But lenity does not always require the "narrowest" construction, and our cases have recognized that a broader construction may be permissible on the basis of nontextual factors that make clear the legislative intent where it is within the fair meaning of the statutory language. See Dixson v. United States, 465 U. S. 482, 500-501, n. 19 (1984). Cf. McBoyle v. United States, 283 U. S. 25, 27 (1931) (a criminal statute should be construed in such a way that its language gives "fair warning" to the "common mind"). Whether lenity should be given the more immediate and dispositive role Justice Scalia espouses is an issue that is not raised and need not be reached in this case.
[7] The Sentencing Guidelines, of course, do not directly apply to juveniledelinquency proceedings. We observe that 28 U. S. C. § 995(a)(19), also enacted as part of the Sentencing Reform Act of 1984, gives the Sentencing Commission power to "study the feasibility of developing guidelines for the disposition of juvenile delinquents." The Government reports that the Sentencing Commission has recently begun such a study. See Brief for United States 11, n. 1.