Justice Alito’s
dissent (the principal dissent) makes much of the fact that 14 States' that use and define the word “proceeds” in their money-laundering statutes,[2] the Model *513 Money Laundering Act, and an international treaty on the subject, all define the term to include gross receipts. See post, at 533-535. We do not think this evidence shows that the drafters of the federal money-laundering statute used “proceeds” as a term of art for “receipts.” Most of the state laws cited by the dissent, the Model Act, and the treaty postdate the 1986 federal money-laundering statute by several years, so Congress was not acting against the backdrop of those definitions when it enacted the federal statute. If anything, they show that “proceeds” is ambiguous and that others who believed that money-laundering statutes ought to include gross receipts sought to clarify the ambiguity that Congress created when it left the term undefined.[3]
Under either of the word’s ordinary definitions, all provisions of the federal money-laundering statute are coherent; *514 no provisions are redundant; and the statute is not rendered utterly absurd. From the face of the statute, there is no more reason to think that “proceeds” means “receipts” than there is to think that “proceeds” means “profits.” Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. See United States v. Gradwell, 243 U. S. 476, 485 (1917); McBoyle v. United States, 283 U. S. 25, 27 (1931); United States v. Bass, 404 U. S. 336, 347-349 (1971). This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress’s stead. Because the “profits” definition of “proceeds” is always more defendant-friendly than the “receipts” definition, the rule of lenity dictates that it should be adopted.
Ill
Stopping short of calling the “profits” interpretation absurd, the Government contends that the interpretation should nonetheless be rejected because it fails to give the federal money-laundering statute its proper scope and because it hinders effective enforcement of the law. Neither contention overcomes the rule of lenity.
A
According to the Government, if we do not read “proceeds” to mean “receipts,” we will disserve the purpose of the federal money-laundering statute, which is, the Government says, to penalize criminals who conceal or promote their illegal activities. On the Government’s view, “[t]he gross receipts of a crime accurately reflect the scale of the criminal activity, because the illegal activity generated all of the *515 funds.” Brief for United States 21; see also post, at 585-537 (Alito, J., dissenting).
When interpreting a criminal statute, we do not play the part of a mindreader. In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. “[Probability is not a guide which a court, in construing a penal statute, can safely take.” United States v. Wiltberger, 5 Wheat. 76, 105 (1820). And Justice Frankfurter, writing for the Court in another case, said the following: “When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.” Bell v. United States, 349 U. S. 81, 83 (1955).
The statutory purpose advanced by the Government to construe “proceeds” is a textbook example of begging the question. To be sure, if “proceeds” meant “receipts,” one could say that the statute was aimed at the dangers of concealment and promotion. But whether “proceeds” means “receipts” is the very issue in the case. If “proceeds” means “profits,” one could say that the statute is aimed at the distinctive danger that arises from leaving in criminal hands the yield of a crime. A rational Congress could surely have decided that the risk of leveraging one criminal activity into the next poses a greater threat to society than the mere payment of crime-related expenses and justifies the money-laundering statute’s harsh penalties.
If we accepted the Government’s invitation to speculate about congressional purpose, we would also have to confront and explain the strange consequence of the “receipts” interpretation, which respondents have described as a “merger problem.” See, e. g., Brief for Respondent Diaz 34. If “proceeds” meant “receipts,” nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotter *516 ies, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U. S. C. § 1955, would “merge” with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both — which would predictably be used to induce a plea bargain to the lesser charge.
The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. New crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds — for example, the felon who uses the stolen money to pay for the rented getaway car — would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares.[4] Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering. There are more than 250 predicate offenses for the money-laundering statute, see Dept, of Justice, Bureau of Justice Statistics, M. Motivans, Money Laundering Offenders, 1994-2001, p. 2 (2003), online at http://www.ojp.usdoj.gov/bjs/pub/ pdf/mloOl.pdf (as visited May 29, 2008, and available in Clerk *517 of Court’s case file), and many foreseeably entail such transactions, see 18 U. S. C. § 1956(c)(7) (2000 ed. and Supp. V) (establishing as predicate offenses a number of illegal trafficking and selling offenses, the expenses of which might be paid after the illegal transportation or sale).
The Government suggests no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime. Interpreting “proceeds” to mean “profits” eliminates the merger problem. Transactions that normally occur during the course of running a lottery are not identifiable uses of profits and thus do not violate the money-laundering statute. More generally, a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute, because by definition profits consist of what remains after expenses are paid. Defraying an activity’s costs with its receipts simply will not be covered.
The principal dissent suggests that a solution to the merger problem may be found in giving a narrow interpretation to the “promotion prong” of the statute: A defendant might be deemed not to “promote” illegal activity “by doing those things ... that are needed merely to keep the business running,” post, at 547-548, because promotion (presumably) means doing things that will cause a business to grow. See Webster’s 2d, at 1981 (giving as one of the meanings of “promote” “[t]o contribute to the growth [or] enlargement” of something). (This argument is embraced by Justice Breyer’s dissent as well. See post, at 530.) The federal money-laundering statute, however, bars not the bare act of promotion, but engaging in certain transactions “with the intent to promote the carrying on of specified unlawful activity.” 18 U.S.C. § 1956(a)(l)(A)(i) (2000 ed.) (emphasis added). In that context the word naturally bears one of its other meanings, such as “[t]o contribute to the . . . prosper *518 ity” of something, or to “further” something. See Webster’s 2d, at 1981. Surely one promotes “the carrying on” of a gambling enterprise by merely ensuring that it continues in business.[5] In any event, to believe that this “narrow” interpretation of “promote” would solve the merger problem one must share the dissent’s misperception that the statute applies just to the conduct of ongoing enterprises rather than individual unlawful acts. If the predicate act is theft by an individual, it makes no sense to ask whether an expenditure was intended to “grow” the culprit’s theft business. The merger problem thus stands as a major obstacle to the dissent’s interpretation of “proceeds.”
Justice Breyer admits that the merger problem casts doubt on the Government’s position, post, at 529, but believes there are “other, more legally felicitous” solutions to the problem, post, at 530. He suggests that the merger problem could be solved by holding that “the money laundering offense and the underlying offense that generated the money to be laundered must be distinct in order to be separately punishable.” Ibid. The insuperable difficulty with this solution is that it has no basis whatever in the words of the statute. Even assuming (as one should not) the propriety of a judicial rewrite, why should one believe that Congress wanted courts to avoid the merger problem in that unusual fashion, rather than by adopting one of the two possible meanings of an ambiguous term? Justice Breyer pins *519 hope on the possibility, “if the ‘merger’ problem is essentially a problem of fairness in sentencing,” that the United States Sentencing Commission might revise its recommended sentences for money laundering. Ibid. See also principal dissent, post, at 547 (in agreement). Even if that is a possibility, it is not a certainty. And once again, why should one choose this chancy method of solving the problem, rather than interpret ambiguous language to avoid it? In any event, as noted, supra, at 515-516, the merger problem affects more than just sentencing; it affects charging decisions and plea bargaining as well.
B
The Government also argues for the “receipts” interpretation because — quite frankly — it is easier to prosecute. Proving the proceeds and knowledge elements of the federal money-laundering offense under the “profits” interpretation will unquestionably require proof that is more difficult to obtain. Essentially, the Government asks us to resolve the statutory ambiguity in light of Congress’s presumptive intent to facilitate money-laundering prosecutions. That position turns the rule of lenity upside down. We interpret ambiguous criminal statutes in favor of defendants, not prosecutors.
It is true that the “profits” interpretation demands more from the Government than the “receipts” interpretation. Not so much more, however, as to render such a disposition inconceivable — as proved by the fact that Congress has imposed similar proof burdens upon the prosecution elsewhere. See 18 U. S. C. § 1963(a) (criminal forfeiture provision requiring determination of “gross profits or other proceeds”); 21 U. S. C. § 853(a) (same).[6] It is untrue that the added burdens *520 “serve no discernible purpose.” Post, at 542 (Alito, J., dissenting). They ensure that the severe money-laundering penalties will be imposed only for the removal of profits from criminal activity, which permit the leveraging of one criminal activity into the next. See supra, at 515.
In any event, the Government exaggerates the difficulties. The “proceeds of specified unlawful activity” are the proceeds from the conduct sufficient to prove one predicate offense. Thus, to establish the proceeds element under the “profits” interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction. And the Government, of course, can select the instances for which the profitability is clearest. Contrary to the principal dissent’s view, post, at 536, 540-542, the fact-finder will not need to consider gains, expenses, and losses attributable to other instances of specified unlawful activity, which go to the profitability of some entire criminal enterprise. What counts is whether the receipts from the charged unlawful act exceeded the costs fairly attributable to it.[7]
*521 When the Government charges an “enterprise” crime as the predicate offense, see, e. g., 18 U. S. C. § 1956(c)(7)(C), it will have to prove the profitability of only the conduct sufficient to violate the enterprise statute. That is typically defined as a “continuing series of violations,” 21 U. S. C. § 848(c)(2), which would presumably be satisfied by three violations, see Richardson v. United States, 526 U. S. 813, 818 (1999). Thus, the Government will have to prove the profitability of just three offenses, selecting (again) those for which profitability is clearest. And of course a prosecutor will often be able to charge the underlying crimes instead of the overarching enterprise crime.
As for the knowledge element of the money-laundering offense — knowledge that the transaction involves profits of unlawful activity — that will be provable (as knowledge must almost always be proved) by circumstantial evidence. For example, someone accepting receipts from what he knows to be a long-continuing drug-dealing operation can be found to know that they include some profits. And a jury could infer from a long-running launderer-criminal relationship that the launderer knew he was hiding the criminal’s profits. Moreover, the Government will be entitled to a willful blindness instruction if the professional money launderer, aware of a high probability that the laundered funds were profits, deliberately avoids learning the truth about them — as might be the case when he knows that the underlying crime is one that is rarely unprofitable.
IV
Concurring in the judgment, Justice Stevens expresses the view that the rule of lenity applies to this case because there is no legislative history reflecting any legislator’s belief *522 about how the money-laundering statute should apply to lottery operators. See post, at 526, 528. The rule of lenity might not apply, he thinks, in a case involving an organized crime syndicate or the sale of contraband because the legislative history supposedly contains some views on the meaning of “proceeds” in those circumstances.[8] See post, at 525-526, and n. 3. In short, Justice Stevens would interpret “proceeds” to mean “profits” for some predicate crimes, “receipts” for others.
Justice Stevens’ position is original with him; neither the United States nor any amicus suggested it; it has no precedent in our cases. Justice Stevens relies on the proposition that one undefined word, repeated in different statutory provisions, can have different meanings in each provision. See post, at 525, and n. 2. But that is worlds apart from giving the same word, in the same statutory provision, different meanings in different factual contexts. Not only have we never engaged in such interpretive contortion; just over three years ago, in an opinion joined by Justice Stevens, we forcefully rejected it.. Clark v. Martinez, 543 U. S. 371 (2005), held that the meaning of words in a statute cannot change with the statute’s application. See id., at 378. To hold otherwise “would render every statute a chameleon,” id., at 382, and “would establish within our jurisprudence ... the dangerous principle that judges can give the same statu *523 tory text different meanings in different cases,” id., at 386. Precisely to avoid that result, our cases often “give a statute’s ambiguous language a limiting construction called for by one of the statute’s applications, even though other of the statute’s applications, standing alone, would not support the same limitation. The lowest common denominator, as it were, must govern.” Id., at 380 (emphasis added).
Our obligation to maintain the consistent meaning of words in statutory text does not disappear when the rule of lenity is involved. To the contrary, we have resolved an ambiguity in a tax statute in favor of the taxpayer in a civil case because the statute had criminal applications that triggered the rule of lenity. See United States v. Thompson/ Center Arms Co., 504 U. S. 505, 517-518, and n. 10 (1992) (plurality opinion). If anything, the rule of lenity is an additional reason to remain consistent, lest those subject to the criminal law be misled. And even if, as Justice Stevens contends, post, at 524, statutory ambiguity “effectively” licenses us to write a brand-new law, we cannot accept that power in a criminal case, where the law must be written by Congress. See United States v. Hudson, 7 Cranch 32, 34 (1812).
We think it appropriate to add a word concerning the stare decisis effect of Justice Stevens’ opinion. Since his vote is necessary to our judgment, and since his opinion rests upon the narrower ground, the Court’s holding is limited accordingly. See Marks v. United States, 430 U. S. 188, 193 (1977). But the narrowness of his ground consists of finding that “proceeds” means “profits” when there is no legislative history to the contrary. That is all that our judgment holds. It does not hold that the outcome is different when contrary legislative history does exist. Justice Stevens’ speculations on that point address a case that is not before him, are the purest of dicta, and form no part of today’s holding. Thus, as far as this particular statute is concerned, counsel remain free to argue Justice Stevens’ view (and to explain *524 why it does not overrule Clark v. Martinez, supra). They should be warned, however: Not only do the Justices joining this opinion reject that view, but so also (apparently) do the Justices joining the principal dissent. See post, at 532, 546.
V
The money-laundering charges brought against Santos were based on his payments to the lottery winners and his employees, and the money-laundering charge brought against Diaz was based on his receipt of payments as an employee. Neither type of transaction can fairly be characterized as involving the lottery’s profits. Indeed, the Government did not try to prove, and respondents have not admitted, that they laundered criminal profits. We accordingly affirm the judgment of the Court of Appeals.

It is so ordered.

 The majority of States with money-laundering laws, in fact, use “proceeds” without defining it. See Colo. Rev. Stat. Ann. § 18-18-408 (2007); Fla. Stat. §896.101 (2006); Ga. Code Ann. §§7-1-911, 7-1-915 (2004); Idaho Code §18-8201 (Lexis 2004); 111. Comp. Stat., ch. 720, §5/29B-l (West 2006); Kan. Stat. Ann. §65-4142 (2002); Minn. Stat. §§609.496 to 609.497 (2006); Miss. Code Ann. §97-23-101 (2006); Mo. Rev. Stat. §574.105 (2007 Supp.); Mont. Code Ann. §45-6-341 (2007); Nev. Rev. Stat. §207.195 (2007); N. Y. Penal Law Ann. §§470.00 to 470.25 (West Supp. 2008); Okla. Stat., Tit. 63, §2-503.1 (West 2001); Ore. Rev. Stat. §164.170 (2007); 18 Pa. Cons. Stat. §5111 (2002); R. I. Gen. Laws §11-9.1-15 (Supp. 2007); S. C. Code Ann. §44-53-475 (2002); Tenn. Code Ann. §§39-14-901 to 39-14-909 (2006). Courts in these States have not construed the term one way or *513 the other. But cf. State v. Jackson, 124 S. W. 3d 139, 143 (Tenn. Crim. App. 2003) (linking “proceeds” with the defined term “property”). California might belong in this list, for it has a money-laundering provision in its Penal Code, in which it uses the term “proceeds” but does not define it. See Cal. Penal Code Ann. § 186.10 (West 1999). But California also has a more limited money-laundering statute that uses and defines “proceeds.” See Cal. Health & Safety Code Ann. § 11370.9(h)(1) (West 2007). Maryland might belong on the list as well: Its general money-laundering statute defines “proceeds” simply to set a minimum value on the proceeds laundered, Md. Crim. Law Code Ann. §5-623(a)(5) (Lexis 2002) (“money or any other property with a value exceeding $10,000”), and its more limited money-laundering statute does not define the term, see § 11-304.

 The principal dissent also suggests that Congress thought “proceeds” meant “receipts” because the House of Representatives (but not the Senate) had passed a money-laundering bill that did not use the word “proceeds” but rather used and defined a term (“criminally derived property”) that, perhaps, included receipts. See post, at 535, n. 5. Putting aside the question whether resort to legislative history is ever appropriate when interpreting a criminal statute, compare United States v. R. L. C., 503 U. S. 291, 306, n. 6 (1992), with id., at 307 (Scalia, J., concurring in part and concurring in judgment), that bit of it is totally unenlightening because we do not know why the earlier House terminology was rejected— because “proceeds” captured the same meaning, or because “proceeds” carried a narrower meaning?

 The Solicitor General suggests that this is the ease even under the “profits” interpretation. See Reply Brief for United States 16; see also post, at 545 (Alito, J., dissenting). That is not so, because when the “loot” comes into the hands of the later distributing felon his confederates’ shares are (as to him) not profits but mere receipts subject to his payment of expenses.

 We note in passing the peculiarity that a dissent which rejects our interpretation of “proceeds” because knowledge of profits will be difficult to prove, suggests an interpretation of “promotes” that will require proving that a particular expenditure was intended, not merely to keep a business “running,” but to expand it. (“You must decide, ladies and gentlemen of the jury, whether it is true beyond a reasonable doubt that the payoff of this winning bettor was not simply motivated by a desire to bring him and other current gambling customers back, but was meant to create a reputation for reliable payoff that would attract future customers.”)

 The principal dissent claims that these statutes do not require proof of profits because the Government could rely upon the “other proceeds” prong, which the dissent interprets to mean all proceeds, gross profits and everything else. See post, at 545. We do not normally interpret a text in *520 a manner that makes one of its provisions superfluous. But even if we did, these provisions would still establish what the dissent believes unthinkable: that Congress could envision the Government’s proving profits.

 The principal dissent asks, “[H]ow long does each gambling ‘instance’ last?” Post, at 543. The answer is “as long as the Government chooses to charge.” Title 18 U. S. C. § 1955(a) provides that “[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both.” An illegal gambling business is an illegal gambling business during each moment of its operation, and it will be up to the Government to select that period of time for which it can most readily establish the necessary elements of the charged offenses, including (if money laundering is one of them) profitability. (To the extent this raises the possibility of the Government’s making multiple violations out of one person’s running of a single business, that problem arises no matter what definition of “proceeds” is adopted.) The “preposterous results” that the dissent attributes to our interpretation of “proceeds,” post, at 544, are in fact the consequence of the Government’s decision to charge Santos *521 with conducting a gambling business over a 6-year period. Of course in the vast majority of cases, establishing the profitability of the predicate offense will not put the Government to the task of identifying the relevant period. Most criminal statutes prohibit discrete, individual acts (fraud, bank robbery) rather than the conduct of a business.

Justice Stevens fails to identify the legislative history to which he refers. He offers only: “As Justice Auto rightly argues, the legislative history of § 1956 makes it clear that Congress intended the term ‘proceeds’ to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales.” Post, at 525-526. Although Justice Alito, from one item of legislative history, draws an inference about the meaning of “proceeds” in all its applications (which we find dubious, see n. 3, swpra), nowhere does he cite legislative history addressing the meaning of the word “proceeds” in cases specifically involving contraband or organized crime. Thus Justice Stevens’ concurrence appears to address not only a hypothetical case, see infra, at 523, but even an imagined legislative history.