964 A.2d 822 (2009)
405 N.J. Super. 353
N.M., Appellant,
v.
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES and Monmouth County Board of Social Services, Respondents.
No. A-0828-07T1
Superior Court of New Jersey, Appellate Division.
Submitted December 2, 2008.
Decided February 26, 2009.
*823 Peluso, Castelluci & Weintraub, P.C., Shrewsbury, attorneys for appellant (Michael E. Weintraub, on the briefs).
Anne Milgram, Attorney General, attorney for respondent Division of Medical Assistance and Health Services (Melissa H. Raksa, Assistant Attorney General, of counsel; Dianna Rosenheim, Deputy Attorney General, on the brief).
Respondent Monmouth County Board of Social Services has not filed a brief.
Before Judges SKILLMAN, GRAVES and GRALL.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
When one member of a married couple enters a nursing home (commonly called the "institutionalized spouse"), the applicable federal Medicaid statutes and regulations require the assets of both that spouse and the spouse who continues to live at home (commonly called the "community spouse") to be taken into account in determining whether the institutionalized spouse's "countable resources" exceed the maximum allowed for Medicaid eligibility.[1] 42 U.S.C.A. § 1396r-5(c)(2). To assure that the community spouse will be able to meet his or her own needs, a portion of the couple's assets is reserved for the community spouse's benefit. 42 U.S.C.A. § 1396r-5(d)(2).
To determine this amount, called the "community spouse resource allowance" (CSRA), the total of all of the couple's assets, whether owned jointly or separately, is calculated as of the date of the institutionalized spouse's institutionalization. 42 U.S.C.A. § 1396r-5(c)(1)(A)(i). One half of this total is then allocated to *824 each spouse. 42 U.S.C.A. § 1396r-5(c)(1)(A)(ii). The one-half share allocated to the community spouse is subject to a ceiling, see 42 U.S.C.A. § 1396r-5(f)(2)(A); 42 U.S.C.A. § 1396r-5(g), which was $99,540 in New Jersey when the Medicaid application involved in this appeal was filed. N.J.A.C. 10:71-4.8. This amount is the CSRA, which is considered unavailable to the institutionalized spouse in determining his or her eligibility for Medicaid.[2] However, all resources above the CSRA, excluding a small sum set aside for the institutionalized spouse, which was $2,000 when the Medicaid application involved in this appeal was filed, N.J.A.C. 10:71-4.5(c), must be spent before the institutionalized spouse can satisfy the resource limit required for Medicaid eligibility. 42 U.S.C.A. § 1396r-5(c)(2); see generally Wisc. Dept. of Health & Family Servs. v. Blumer, 534 U.S. 473, 481-82, 122 S.Ct. 962, 967-69, 151 L.Ed.2d 935, 944-46 (2002).
The issue presented by this appeal is whether the state agency responsible for administering the Medicaid program, which in this State is the respondent Division of Medical Assistance and Health Services, N.J.A.C. 10:71-1.5, may consider the value of an annuity purchased for the sole benefit of the community spouse in determining the institutionalized spouse's eligibility for Medicaid. We conclude that under an amendment to the federal Medicaid statutes contained in the Deficit Reduction Act of 2005, 120 Stat. 4, such an annuity may now be considered in determining Medicaid eligibility.

I.
The appellant, N.M., entered King Manor Care Center, a nursing home, as a private pay patient in December 2004. N.M.'s husband, A.M., remained in the couple's marital residence in Oceanport, New Jersey. When N.M. entered the nursing home, she and A.M. had bank accounts and other investments with a total value of $311,051.83.
On July 5, 2006, an application was made on N.M.'s behalf for Medicaid Only eligibility, effective July 1, 2006. Two weeks before this application, A.M. used $131,500 of the couple's assets to purchase a commercial annuity, under which he is entitled to receive monthly payments of $2,917 for forty-eight months. A.M. is the sole beneficiary of this annuity, which is non-assignable and nontransferable. However, if A.M. dies before all the payments are made, the State will become the remainder beneficiary to the extent of any Medicaid benefits paid on N.M.'s behalf and the balance of the annuity will be payable to A.M.'s estate.
Respondent Monmouth County Board of Social Services (Board) denied N.M.'s application for Medicaid Only benefits on the ground that she and A.M. had "available resources" that exceeded the maximum amount allowed for eligibility. In making this determination, the Board took into account the value of the income stream from the annuity purchased by A.M. The Board found that N.M.'s and A.M.'s countable resources at the time of the application, including the value of the income stream from the annuity, totaled $194,818, and that after deducting the $99,540 CSRA protected for A.M. as the "community spouse" and the $2,000 an applicant is permitted to retain, the couple still had *825 $93,278.16 in resources that needed to be spent down before N.M. would become eligible for Medicaid.
N.M. appealed the denial of her application to the respondent Division of Medical Assistance and Health Services (Division), which referred the matter to the Office of Administrative Law. A contested case hearing was conducted before an Administrative Law Judge (ALJ),[3] at which it was stipulated that "the income stream of the annuity [purchased by A.M.] can be sold... on the secondary market." The parties also stipulated that, in addition to the $2,917 monthly payment A.M. received from the commercial annuity, A.M. received $4,068 from a government pension, $707 from social security, $192 in veteran's benefits and $68 in other income. Thus, A.M.'s monthly income was nearly $8,000.
A representative of the Board testified that the commercial annuity A.M. purchased was treated as an available asset with a value of $90,203 based on an offer by Peachtree Settlement Funding to purchase the income stream from the annuity for that amount. This asset, combined with the parties' other assets, exceeded the $99,540 CSRA that A.M. could retain while preserving N.M.'s eligibility for Medicaid.
The ALJ concluded in his recommended initial decision that under the Deficit Reduction Act of 2005(DRA), 120 Stat. 4, specifically the subsection codified as 42 U.S.C.A. § 1396p(e)(4), the value of the income stream from the commercial annuity purchased by A.M. can be considered an available resource for the purpose of determining N.M.'s Medicaid eligibility because it can be sold on the open market. He further concluded that A.M. and N.M.'s available resources exceeded the maximum allowed for Medicaid eligibility, and that in the absence of a showing that this annuity income was necessary to meet A.M.'s monthly maintenance needs, the Board properly denied N.M.'s application for Medicaid.
The Director of the Division of Medical Assistance and Health Services adopted the ALJ's proposed initial decision and affirmed the Board's denial of N.M.'s application.

II.
The Medicaid Program established by Title XIX of the Social Security Act (the "Act"), 42 U.S.C.A. § 1396 to § 1396w-1, is a joint federal-state program designed to provide medical assistance to individuals "whose income and resources are insufficient to meet the cost of necessary medical services." 42 U.S.C.A. § 1396. A state's participation in the Medicaid program is optional. Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 165, 712 A.2d 188 (1998).
Any state that participates in the Medicaid program must "`develop [] a plan containing reasonable standards for determining eligibility for ... medical assistance' within boundaries set by the Medicaid statute and the Secretary of Health and Human Services." Blumer, supra, 534 U.S. at 479, 122 S.Ct. at 966, 151 L.Ed.2d at 943 (internal quotation marks omitted). "In formulating these standards States must `provide for taking into account only such income and resources as are, as determined by standards prescribed by the Secretary, available to the applicant.' § 1396(a)(17)(B) (emphasis added)." Ibid.
Until 1989, states generally considered the income of either spouse to be "available" to the other in determining eligibility *826 for Medicaid. See id. at 479, 122 S.Ct. at 967, 151 L.Ed.2d at 944. States also considered all of a married couple's jointly held assets to be resources available to both spouses. See id. at 480, 122 S.Ct. at 967, 151 L.Ed.2d at 944. As a result, when the institutionalized spouse entered a nursing home, all of the couple's assets, except for assets held individually by the community spouse, had to be spent down to the Medicaid eligibility limits before the institutionalized spouse would be eligible for Medicaid. See Mistrick, supra, 154 N.J. at 169, 712 A.2d 188.
However, Congress enacted the Medicare Catastrophic Coverage Act of 1988 (MCCA), 102 Stat. 754, 42 U.S.C.A. § 1398r-5, the purpose of which was "to end the pauperization of the community spouse by allowing that spouse to protect a sufficient, but not excessive, amount of income and resources to meet his or her own needs while the institutionalized spouse was in a nursing home at Medicaid expense." Mistrick, supra, 154 N.J. at 170, 712 A.2d 188. "To achieve this aim, Congress installed a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." Blumer, supra, 534 U.S. at 480, 122 S.Ct. at 967, 151 L.Ed.2d at 944.[4] Under those requirements, "no income of the community spouse shall be deemed available to the institutional spouse." 42 U.S.C.A. § 1396r-5(b)(1). However, as previously discussed, any resources of the community spouse that exceed the CSRA are considered available to the institutionalized spouse and must be spent before the institutionalized spouse can become eligible for Medicaid. 42 U.S.C.A. § 1396r-5(c)(2).
Before enactment of the DRA, courts had reached conflicting conclusions as to whether the purchase of a commercial annuity for the benefit of the community spouse was a proper way to spend down resources below the CSRA in order to qualify the institutionalized spouse for Medicaid. In Estate of Gross v. N.D. Dep't. of Human Servs., 687 N.W.2d 460, 466 (N.D.2004), the court held that such an annuity could not be used to spend down resources below the CSRA because "there was a market for the monthly payments or income stream from the annuity[.]" See also Dempsey v. Dep't. of Pub. Welfare, 756 A.2d 90, 95-96 (Pa.Commw.Ct.2000); cf. In re Estate of Pladson v. Traill County Soc. Servs., 707 N.W.2d 473, 479-81 (N.D.2005).
On the other hand, in Mertz v. Houstoun, 155 F.Supp.2d 415, 426 (E.D.Pa. 2001), the court held that "[b]ecause at the time of [the] application [for Medicaid benefits for the institutionalized spouse] neither spouse has an ownership interest in the funds [that were] used to purchase [the] annuity, the funds are not a countable resource in calculating the CSRA." Based on this reasoning, the court concluded that "a couple may effectively convert countable resources into income of the community spouse which is not countable in determining Medicaid eligibility for the institutionalized spouse by purchasing the irrevocable actuarially sound commercial annuity for the sole benefit of the community spouse." Id. at 427. Although the court felt that this conclusion was mandated by the federal statutory provisions that then governed the Medicaid program, it also expressed the view that the ability to convert countable resources into income of *827 the community spouse was contrary to the purposes of the Medicaid program:
It is a loophole apparently discerned by lawyers and exploited by issuers who advertise such annuities as a means to qualify for Medicaid benefits.
The practice is inconsistent with an apparent purpose of the MCCA and indeed the whole thrust of the Medicaid program which is to provide assistance to those truly in need. It has no doubt frustrated not only the [Pennsylvania Department of Public Welfare] but also program administrators in other states.
....
It is not the role of the court to compensate for an apparent legislative oversight by effectively rewriting a law to comport with one of the perceived or presumed purposes motivating its enactment. It is for the Congress to determine if and how this loophole should be closed.
[Id. at 427.]
This court had followed Mertz before enactment of the DRA and held in two published opinions that the purchase of an irrevocable commercial annuity under which periodic payments of income are made to the community spouse can be used to reduce the community spouse's resources below the CSRA in order to qualify the institutionalized spouse for Medicaid. Estate of F.K. v. Div. of Med. Assistance & Health Servs., 374 N.J.Super. 126, 139-46, 863 A.2d 1065 (App. Div.), certif. denied, 184 N.J. 209, 876 A.2d 283 (2005); A.B. v. Div. of Med. Assistance & Health Servs., 374 N.J.Super. 460, 465-66, 865 A.2d 701 (App.Div.), certif. denied, 185 N.J. 38, 878 A.2d 855 (2005). In F.K., we rejected the Division's argument that the value of an annuity should be considered a resource in determining the CSRA "because it has a market value given that the income stream from the annuity can be sold in exchange for a lump sum payment." Id. at 143, 863 A.2d 1065. In reaching this conclusion, we noted that "nothing in the record indicates that there is a market for that income stream." Id. at 145, 863 A.2d 1065. Similarly, we noted in A.B. that "DMAHS has produced no evidence that a secondary market exists for the type of commercial annuity involved in this case." 374 N.J.Super. at 468, 865 A.2d 701.
Unlike in F.K. and A.B., the Board presented evidence at the hearing on N.M.'s application that the commercial annuity purchased by A.M. had a market value of $90,203. Moreover, N.M. stipulated that "the income stream of the annuity [A.M. purchased] can be sold ... on the secondary market." However, we have no need to consider whether such evidence would have required a different result than in F.K. and A.B. even under the governing law before enactment of the DRA because we conclude that the DRA significantly changed prior law.

III.
By enactment of the DRA, Congress undertook to close loopholes in the federal statutory provisions governing the Medicaid program that had allowed individuals with sufficient assets to pay for their own medical care to qualify for Medicaid, including the type of loophole identified in Mertz. In his statement in support of this proposed law, Senator Grassley, then the Chairman of the Senate Finance Committee, stated that the DRA "closes loopholes in current Medicaid law concerning transfer of assets to limit the circumstances under which persons may intentionally shelter assets in order to qualify for Medicaid." 151 Cong. Rec. S12071. In the House hearings on the proposed law, Representative Cantor stated that the DRA would allow the government "to root out the asset transfer fraud that is going on *828 with many in this country, which essentially allows those who could otherwise afford to pay for their health care services to become wards of the State." 152 Cong. Rec. H9550. Similarly, another Congressman, Representative Joseph Barton of Texas, stated that enactment of the DRA would "make it more difficult to hide assets so that wealthy clients can pretend to be poor to qualify for long-term Medicaid coverage in nursing homes." 152 Cong. Rec. H45-46.
One new provision of the DRA, 42 U.S.C.A. § 1396p(e)(1), imposes an obligation upon any applicant for Medicaid benefits for "long-term care services" to "disclose a description of any interest the [applicant] or community spouse has in an annuity ... regardless of whether the annuity is irrevocable or is treated as an asset." Another provision, 42 U.S.C.A. § 1396p(e)(4), states that "[n]othing in this subsection shall be construed as preventing a State from denying eligibility for medical assistance for an individual based on the income or resources derived from an annuity described in [42 U.S.C.A. § 1396p(e)(1)]."
There is as yet no reported opinion interpreting 42 U.S.C.A. § 1396p(e)(4).[5] However, the Division's interpretation of this subsection is supported by the position of the Center for Medicaid and Medicare Services (CMS), an agency within the Department of Health and Human Services to which the Secretary of Health and Human Services has delegated responsibility to administer and oversee the Medicaid program. See 66 Fed.Reg. 35437 (July 5, 2001). We have previously noted that "due to the extraordinary complexity of the Medicaid Act, Congress delegated to the CMS broad authority to define eligibility requirements for Medicaid." A.B., supra, 374 N.J.Super. at 465, 865 A.2d 701; see also Schweiker v. Gray Panthers, 453 U.S. 34, 43-44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460, 469-70 (1981). Consequently, even when not formalized by adoption of an administrative regulation, the CMS's interpretation of the federal statutes governing the Medicaid program is "entitled to respectful consideration and deference." F.K., supra, 374 N.J.Super. at 142, 863 A.2d 1065.
Shortly after enactment of the DRA on February 8, 2006, the CMS issued a publication, dated July 27, 2006, entitled "Changes in Medicaid Annuity Rules Under the Deficit Reduction Act of 2005," which states:

The State may take into consideration the income or resources derived from an annuity when determining eligibility for medical assistance or the extent of the State's obligations for such assistance. This means that even though an annuity is not penalized as a transfer for less than fair market value ..., it must still be considered in determining eligibility, including spousal income and resources, and in the post-eligibility calculation, as appropriate. In other words, even if an annuity is not subject to penalty under the provisions of the DRA, this does not mean that it is excluded as income or resource.
[Emphasis added.]
*829 Thus, the federal agency responsible for interpreting the federal statutes governing the Medicaid program has concluded that under the DRA a "State may take into consideration the income ... derived from an annuity when determining eligibility for [Medicaid]." Ibid. This is precisely what the Division did in upholding the Board's denial of N.M.'s application for Medicaid. In view of the deference that state agencies responsible for administering the Medicaid program and courts reviewing their decisions are supposed to extend to the CMS's interpretation of the federal statutes governing Medicaid, the CMS's interpretation should be followed unless an adversely affected party can show that this interpretation is clearly unreasonable.
We recognize that 42 U.S.C.A. § 1396p(e)(4) is not a model of clarity. Nevertheless, we conclude that its statement that "nothing in this subsection shall be construed as preventing a State from denying eligibility for medical assistance for an individual based on the income or resources derived from an annuity described in [42 U.S.C.A. § 1396p(e)(1)]," can be reasonably interpreted to authorize a State to consider the value of the income stream from an annuity purchased for the benefit of the community spouse as a countable resource in determining the institutionalized spouse's eligibility for Medicaid. Therefore, the CMS's interpretation of this subsection of the DRA is reasonable and should be followed.
N.M.'s primary argument is that the provisions of the DRA which impose a transfer penalty upon certain specified annuity purchases, see 42 U.S.C.A. § 1396p(c)(1)(F); 42 U.S.C.A. § 1396p(c)(1)(G)(ii), constitute the exclusive authorization under the DRA for a State to consider an annuity purchased for the community spouse in determining the institutionalized spouse's Medicaid eligibility. However, the previously quoted CMS publication specifically rejects this interpretation of the DRA, noting that "even though an annuity is not penalized as a transfer for less than fair market value..., it must still be considered in determining eligibility, including spousal ... resources." CMS, Enclosure to State Medicaid Director Letter No. 06-018 p. 12 (2006). Thus, the Division's determination that N.M. is ineligible for Medicaid was not a "penalty" for A.M. transferring a substantial portion of the couple's assets into an annuity. It was simply a determination that the couple had too many resources for N.M. to meet the requisite level of need for Medicaid eligibility.
Moreover, although the annuity purchased by A.M. states that it is non-assignable, another publication issued by the CMS, dated August 6, 2007, entitled "Clarification" of the previously quoted July 27, 2006 publication "Concerning Treatment of Annuities Under Deficit Reduction Act of 2005," states that "[i]f the ... payee [of an annuity] may be changed, it means the annuity is `assignable,' which in turn means the annuity can be sold on the secondary market. In [such a] case, an annuity ... is a countable resource." CMS, State Agency Regional Bulletin No.2007-09 p. 1 (2007) N.M. stipulated that "the income stream of the annuity [purchased for A.M.'s benefit] can be sold by [A.M.] on the secondary market." Consequently, this annuity is considered assignable under the August 6, 2007 CMS publication.
N.M. relies upon James v. Richman, 465 F.Supp.2d 395 (M.D.Pa.2006), aff'd, 547 F.3d 214 (3d Cir.2008), which held that an annuity purchased by a community spouse could not be considered an available resource in determining the institutionalized spouse's eligibility for Medicaid. However, the application for Medicaid benefits *830 involved in James was made on September 20, 2005, 547 F.3d at 216, which was before the February 8, 2006 effective date of the DRA. Thus, James was controlled by the statutory provisions that governed Medicaid before enactment of the DRA. For that reason, neither the district court nor the court of appeals even cited 42 U.S.C.A. § 1396p(e)(4) or the July 27, 2006 and August 6, 2007 CMS publications dealing with the treatment of annuities purchased on behalf of the community spouse.
In sum, we conclude that under the DRA a state may now consider the value of an annuity purchased for the sole benefit of the community spouse in determining whether the institutionalized spouse satisfies the resource limits for Medicaid eligibility.
At the hearing on N.M.'s application for Medicaid, the Board presented evidence that Peachtree Settlement Funding had offered to pay a $90,203 lump sum in exchange for the payments remaining on the annuity purchased by A.M. Under the DRA, this sum, combined with A.M.'s other countable resources, exceeded the CSRA that governed the determination of the resource limit for Medicaid eligibility during 2006 when N.M. applied for benefits. Therefore, the Division properly denied N.M.'s application.
Affirmed.
NOTES
[1] To be eligible for Medicaid, an applicant must satisfy both "resource" and "income" eligibility limits. See 42 C.F.R. § 435.845 (resource eligibility); 42 C.F.R. § 435.831 (income eligibility). Although the community spouse's resources must be taken into account in determining whether the institutionalized spouse satisfies the resource eligibility limit, the community spouse's income may not be considered in determining whether the institutionalized spouse satisfies the income eligibility limit. 42 U.S.C.A. § 1396r-5(b)(1). The income eligibility limit is not at issue in this appeal.
[2] The community spouse is entitled to a higher CSRA if he or she can show that a greater amount is required to realize the community spouse's "maximum monthly maintenance needs allowance." 42 U.S.C.A. § 1396r-5(e)(2)(B). This potential adjustment of the CSRA is not implicated in the present appeal.
[3] The transcript of this hearing was lost. Pursuant to Rule 2:5-3(f), the parties have entered into a stipulation of proceedings in lieu of transcript.
[4] Congress later repealed MCCA through the Medicare Catastrophic Coverage Repeal Act of 1989, 103 Stat. 1979, but the spousal impoverishment prevention provisions were retained at 42 U.S.C.A. § 1396r-5.
[5] A recently issued memorandum opinion of a federal district court reaches a conclusion contrary to the conclusion reached in this opinion. Weatherbee v. Richman, No. 07-134, 2009 WL 161624, 2009 U.S. Dist. Lexis 4402 (W.D.Pa. Jan. 22, 2009). However, there is no indication that opinion will be approved for publication. Therefore, it is not precedential, R. 1:36-3, and for that reason is not discussed in this opinion. We only note that the federal district court opinion does not refer to the CMS publications discussed in this and the next six paragraphs of our opinion.