# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

REBECCA G. HUTCHERSON,
            *Plaintiff-Appellant,*

v.

ARIZONA HEALTH CARE COST
CONTAINMENT SYSTEM
ADMINISTRATION, and THOMAS J.
BETLACH, in his capacity as
Director of AHCCCS,
            *Defendants-Appellees.*

No. 10-16426

D.C. No.
2:09-cv-00898-JAT

OPINION

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted
August 30, 2011—San Francisco, California

Filed January 27, 2012

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and Robert J. Timlin,
Senior District Judge.*

Opinion by Judge Timlin

---

*The Honorable Robert J. Timlin, United States District Judge for the
Central District of California, sitting by designation.

## COUNSEL

Eric K. Macdonald and Ryan K. Hodges (argued), Jackson White, Mesa, Arizona, for the appellant.

Timothy D. Ducar (argued), Lorona Steiner Ducar, Ltd., Phoenix, Arizona, for the appellees.

## OPINION

TIMLIN, Senior District Judge:

Rebecca Hutcherson ("Appellant") appeals the district court's judgment granting summary judgment to Arizona Health Care Cost Containment System Administration and Thomas Betlach (collectively "AHCCCS"). We hold that the 2006 amendment to 42 U.S.C. § 1396p(c)(1)(F)(i) creates a right in the State to recover as a remainder beneficiary against a community spouse's annuity for an institutionalized spouse's medical costs. We further hold that the State's recovery is not limited to the amount it paid for the institutionalized spouse's medical costs as of the date of the community spouse's death. Accordingly, we affirm.

## I.

Appellant is the daughter of John and Betty Hutcherson.[1] At some point, Betty required long-term care in a nursing

---

[1] For ease of reference, we will refer to John and Betty Hutcherson by their first names.

home or similar facility. In June 2007, Betty applied for Medicaid assistance from AHCCCS. Betty did not qualify for Medicaid assistance at that time because the Hutchersons' assets exceeded the limit to qualify. In order for Betty to qualify for Medicaid assistance, John "spent down" his assets by purchasing an annuity in his name for $100,000. The annuity paid a fixed monthly amount of $2,781.63 for 36 months. AHCCCS was listed as the annuity's remainder beneficiary in the first position, as required by the Medicaid statute, and Appellant was listed as the remainder beneficiary in the second position.

On April 5, 2008, John died. At that time, the annuity had a remaining value of approximately $75,000. The annuity provided that, at the time of the annuitant's death, the beneficiary could choose to either be paid a lump sum or receive the remaining monthly annuity payments as scheduled. AHCCCS opted to receive the monthly payments from the annuity.

At the time of John's death, AHCCCS had paid $23,840.51 for Betty's medical care. Following John's death, AHCCCS continued to pay for Betty's care at a monthly cost of $2,552.92. AHCCCS deducted this continuing monthly cost from the monthly annuity payments it was receiving and applied the remaining $228.71 to the $23,840.51 that it had paid for Betty's care prior to John's death.

Betty stopped receiving Medicaid assistance from AHCCCS in 2009. The annuity was then used by AHCCCS to pay off the remaining balance of the $23,840.51 and AHCCCS released its claim on the annuity. In total, AHCCCS received $60,840.51 from the annuity before the remaining value was paid to Appellant as the secondary remainder beneficiary.

On April 29, 2009, Appellant filed a declaratory judgment action seeking a declaration that AHCCCS had no right to recover from John's annuity at all or, alternatively, had no right to recover for any costs incurred for the care Betty

received after John's death. The parties filed cross-motions for summary judgment following discovery. The district court granted AHCCCS's motion, concluding that (1) 42 U.S.C. § 1396p(c)(1)(F)(i) was validly enacted by Congress and is binding on Appellant; (2) AHCCCS could recover from the annuity for costs it incurred on Betty's behalf; and (3) AHCCCS could recover for amounts it spent on Betty's care after John's death.

Appellant timely filed this appeal.

## II.

We have jurisdiction over this case pursuant to 28 U.S.C. § 1291. We review *de novo* a district court's grant of summary judgment. *City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 446 (9th Cir. 2011).

## III.

Medicaid is a cooperative program through which the federal government reimburses states for some costs they incur in providing medical assistance to the poor. *See Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 479 (2002). Each state develops its own plan for determining Medicaid eligibility based on standards established by the federal government, taking into account the income and assets of the applicant. *Id.*

Unique problems arose regarding Medicaid eligibility for spouses given that they generally share income and assets. *See id.* at 479-80. For example, states generally considered income from either spouse and jointly-held assets in determining the Medicaid eligibility for the institutionalized spouse, but did not consider assets held solely in the name of the community spouse. *Id.*[2] As a result, some community spouses

---

[2]"Community spouse" refers to the spouse of an institutionalized person who continues to live at home. *See Blumer*, 534 U.S. at 478.

were left destitute so that the institutionalized spouse could qualify for Medicaid assistance, while some wealthy couples were able to qualify for assistance by simply holding their assets solely in the name of the community spouse. *Id.* at 480. Congress responded to this problem by passing the Medicare Catastrophic Coverage Act of 1988 ("MCCA"), which had the dual aim of ending the "pauperization" of community spouses and preventing wealthy couples from qualifying for Medicaid assistance by sheltering their assets. *Id.*; *see also J.P. v. Mo. State Family Support Div.*, 318 S.W.3d 140, 142 (Mo. Ct. App. 2010) ("In enacting the MCCA, Congress sought to protect the community spouse from poverty, but it also wanted to protect the Medicaid system from abuse.").

[1] One provision of the MCCA allows an institutionalized spouse to qualify for Medicaid assistance while reserving for the community spouse a capped amount of assets for the community spouse's benefit, known as the "community spouse resource allowance" or "CSRA." *Blumer*, 534 U.S. at 482. The CSRA is designed to ensure that the community spouse can meet his or her minimum monthly maintenance needs. *See id.* at 478. All assets above the CSRA must be spent before the institutionalized individual can be eligible for Medicaid assistance. *See id.* at 483.

Congress regulates the means by which couples may spend down their assets to qualify an institutionalized individual for Medicaid assistance. The Medicaid Act prevents wealthy couples from qualifying for Medicaid by imposing a penalty when couples attempt to dispose of assets that could otherwise be used to pay for the institutionalized spouse's medical care. If a couple disposes of any property for less than fair market value during a five-year "look back" period, the institutionalized spouse is not eligible to receive coverage for an amount of time equal to the "total, cumulative uncompensated value of all assets transferred by the individual (or individual's spouse) . . . divided by . . . the average monthly cost to a private patient of nursing facility services in the State." 42

U.S.C. § 1396p(c)(1)(A), (E). In other words, if either spouse tries to give away assets, the institutionalized spouse will be ineligible for Medicaid benefits for the length of time that those assets could have covered the spouse's medical costs. The effect is to treat couples who dispose of assets as if those assets were available to the couple to pay for medical care.

**[2]** Congress has, however, provided specific ways that a community spouse may spend down his or her assets without affecting the institutionalized spouse's eligibility for Medicaid. Of relevance here, the Medicaid statute allows the community spouse to purchase an annuity. *See* 42 U.S.C. § 1396p(c)(1)(F)(i). This provision protects the community spouse from destitution by allowing the spouse to convert his or her assets, which are considered in determining the institutionalized spouse's eligibility, to income, which is not considered. *See* 42 U.S.C. § 1396r-5(b)(1), (c)(1).

In 2005, Congress passed the Deficit Reduction Act ("DRA"), which sought to further close loopholes in the Medicaid Act. *See, e.g.*, *N.M. v. Div. of Med. Assist. & Health Servs.*, 964 A.2d 822, 827-28 (N.J. Sup. Ct. App. Div. 2009) (discussing the DRA's legislative history); *see also Mackey v. Dep't of Human Servs.*, ___ N.W.2d ___, 289 Mich. App. 688, 2010 WL 3488988, at *4 n.7 (Mich. Ct. App. Sept. 7, 2010) ("[W]hen signing into law the Deficit Reduction Act of 2005, President George W. Bush stated that the act "'tightens the loopholes that allowed people to game the system by transferring assets to their children so they can qualify for Medicaid benefits.'' ") (quoting Reif, *A Penny Saved Can Be A Penalty Earned: Nursing Homes, Medicaid Planning, The Deficit Reduction Act of 2005, And The Problem of Transferring Assets*, 34 NYU Review of Law & Social Change 339, 347 (2010)). The DRA added several requirements that must be met before an annuity is exempt from the transfer penalty. For instance, the annuity must (i) be irrevocable and nonassignable, (ii) be actuarially sound, and (iii) provide for payments in equal amounts with no deferral and no balloon

payments. *Id.* § 1396p(c)(1)(G)(ii). In addition, and of particular relevance to this case, the DRA originally provided that the purchase of an annuity is allowable only where "the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the *annuitant*." 42 U.S.C. § 1396p(c)(1)(F)(i) (2005) (emphasis added).

**[3]** In 2006, Congress amended the language of § 1396p(c)(1)(F)(i). Under the amended language, spouses may purchase an annuity to spend down their assets only if "the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the *institutionalized individual*." 42 U.S.C. § 1396p(c)(1)(F)(i) (2006) (emphasis added); *see also* Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922, 2998 (2006).

## IV.

The issues raised on appeal turn on our interpretation of § 1396p(c)(1)(F)(i), as amended in 2006. In construing a statute, we first look to the plain meaning of that statute. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). If the plain meaning is clear, our analysis generally ends and we apply that plain meaning. *See id.*; *see also Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (plain language of text controls so long as outcome is not absurd). Interpretation of this provision "depends upon reading the whole statutory text, considering the purpose and context of the statute." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S.Ct. 1325, 1330 (2011) (citation omitted).

## A.

John purchased the annuity at issue in this case in 2007 to enable Betty to qualify for Medicaid assistance. For the annu-

ity to qualify as a permissible means of "spending down" assets, John named the State as the remainder beneficiary in the first position, as required by § 1396p(c)(1)(F). Appellant, who was named as the second beneficiary, contends that AHCCCS was not entitled to any reimbursement from the annuity because AHCCCS's recovery was limited to expenses incurred on behalf of John, who was never institutionalized. We disagree.

[4] Section 1396p(c)(1)(F)(i) provides that spouses may not "spend down" by purchasing an annuity unless "the State is named as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual." 42 U.S.C. § 1396p(c)(1)(F)(i). By its plain terms, the provision allows the State to recover the expenses incurred on behalf of "the institutionalized individual," in this case, Betty.

Appellant observes that AHCCCS would not have been entitled to recover Betty's medical costs from the annuity under the previous version of § 1396p(c)(1)(F)(i). She urges us to ignore the plain meaning of the 2006 amendment because Congress labeled the amendment as a "technical correction." *See* Tax Relief & Health Care Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922, 2996 (2006). According to Appellant, the "technical" character of the amendment indicates that Congress was merely trying to "clarify" the law and not to make substantive changes to the law. Thus, Congress intended that we interpret "institutionalized individual" to mean "annuitant" despite the different meanings of those words.

[5] We disagree. The best indicator of congressional intent is the language of a statute itself. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 n.13 (1985). The term "institutionalized individual" is specifically defined by the statute to mean "an individual who is an inpatient in a nursing facility, who is an inpatient in a medical institution and with respect

to whom payment is made based on a level of care provided in a nursing facility, or who is described in section 1396a(a)(10)(A)(ii)(VI) of this title." 42 U.S.C. § 1396p(h)(3). Here, that definition captures only Betty.

That Congress labeled its amendment as a "technical correction" does not defeat the plain language of the statute. *See United States v. R.L.C.*, 503 U.S. 291, 305 n.5 (1992) (plurality) (rejecting the contention that the usual tools of statutory construction do not apply to technical amendments); *see also id.* at 307 (Scalia, J., concurring) ("The Court begins its analysis, quite properly, by examining the language of [the statute] . . .").[3]

**[6]** We will give the plain meaning to the unambiguous language in § 1396p(c)(1)(F)(i), which allows states to reach a deceased community spouse's annuity for costs incurred on behalf of an institutionalized spouse. We therefore hold that AHCCCS was entitled to recover as the primary remainder beneficiary from John's annuity for the amount of medical costs it paid on behalf of Betty.

## B.

Appellant argues in the alternative that AHCCCS's interest as a remainder beneficiary in the first position was limited to the amount it had paid on behalf of Betty as of the date of John's death. Appellant's argument again turns on the language of the statute, which requires an annuitant to name the State "as the remainder beneficiary in the first position for at least the total amount of medical assistance paid on behalf of the institutionalized individual." 42 U.S.C.

---

[3]Appellant also notes that the amendment's retroactivity "is an indicia of [its] technical nature." Congress's indication that the amendment should apply retroactively does not alter our analysis in light of the statute's plain language. We express no opinion as to whether retroactive application of the amendment would raise a due process issue.

§ 1396p(c)(1)(F)(i). Appellant contends that the provision's use of "paid" in the past tense evidences a congressional intent to cap a state's recovery at the amount it had paid up to the date of the annuitant's death. Hence, any additional amount from the annuity would be disbursed to the remainder beneficiary in the second position even though the State continues incurring costs on behalf of the annuitant's spouse.

**[7]** We disagree. To begin with, nothing in the statutory language is inconsistent with permitting AHCCCS to recover from the annuity expenses incurred after John's death. In doing so, AHCCCS would be recovering the "medical assistance paid on behalf of the institutionalized individual," Betty, as § 1396p(c)(1)(F)(i) permits. This interpretation is also the most consistent with the statutory scheme and purpose. As noted above, the provisions regarding transferring assets were tailored to balance Congress's desire to avoid impoverishment of the community spouse, on the one hand, and closing loopholes that allowed wealthy couples to game the system, on the other hand. The annuity payments to AHCCCS as a beneficiary functioned precisely the way the statute was intended to work. The Hutchersons were able to qualify Betty for Medicaid assistance, while ensuring that John did not become impoverished. As part of that balance, AHCCCS was named as the primary remainder beneficiary of John's annuity so that it could recoup its costs for the medical care that Betty received in the event that John died before the annuity had run its course.

Accepting Appellant's position that the state should not recover and, instead, she should inherit what remained in John's annuity would frustrate the purpose of the Medicaid statute. As we have noted above, Congress prevents the community spouse from disposing of assets that would otherwise be available to pay for the institutionalized spouse's medical care. For instance, if John, instead of purchasing the annuity, attempted to transfer funds to Appellant, Betty would have been ineligible for Medicaid for the approximate length of

time that the funds could have covered Betty's medical costs. By purchasing an annuity, John avoided this transfer penalty. Consistent with the Medicaid Act's objective of protecting the community spouse from destitution, John was entitled to collect monthly payments from the annuity for as long as he lived. When John died before the annuity ran its course, however, funds remained in the annuity that could have otherwise been used to pay for Betty's medical care. To limit AHCCCS's recovery to the medical expenses incurred before John's death would allow the Hutchersons to keep money and transfer money that would have otherwise made them ineligible for Medicaid. The Medicaid Act, through the transfer penalty and the DRA amendments to the annuity provision, reflect a clear intent to prevent individuals from sheltering funds in this manner.

[8] We therefore conclude that AHCCCS could be reimbursed as the primary remainder beneficiary from John's annuity for the cost of the medical assistance it paid on Betty's behalf after John's death.

## V.

Accordingly, we AFFIRM the judgment of the district court granting summary judgment to AHCCCS and Betlach.