# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3411-17T4

J.D., o/b/o K.D.,

     Petitioner-Appellant,

v.

DEPARTMENT OF CHILDREN
AND FAMILIES, DIVISION OF
CHILDREN'S SYSTEM OF CARE,

     Respondent-Respondent.

_____

        Submitted January 28, 2020 – Decided August 19, 2020

        Before Judges Accurso and Gilson.

        On appeal from the New Jersey Department of Children and Families, Division of Children's System of Care, AHU No. 17-0056.

        Disability Rights New Jersey, attorneys for appellant (Mary A. Ciccone and Susan Saidel, on the briefs).

        Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Mark D. McNally, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner J.D. appeals from a final agency decision upholding the plan of the Department of Children and Families, Division of Children's System of Care to reduce the behavioral services it provides to her minor son, K.D., to address his severe autism. She argues that she was inappropriately assigned the burden of proof in the hearing before the Office of Administrative Law as to the reasonableness of the plan and that, in any event, the Division's decision was contrary to federal Medicaid law and the Americans with Disabilities Act under Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 587, 597 (1999).

The Division counters that J.D. was appropriately assigned the burden of proof on the case she brought at the OAL, a challenge to the Division's decision regarding her son's eligibility for services, see N.J.A.C. 3A:40-5.1(b), and that we should not consider the other issues J.D. raises regarding Medicaid law and Olmstead because J.D. never addressed those issues during the hearing, raising them only in her written summation to the Administrative Law Judge. The Division asserts it was thus deprived the opportunity to create a record on those issues, contrary to N.J.S.A. 52:14B-9(c), and, indeed, that it is not even clear the OAL has jurisdiction to address ADA claims, see Hirsch v. N.J. State Bd. of Med. Exam'rs, 128 N.J. 160, 161-62 (1992).

A-3411-17T4

J.D. does not dispute that she did not raise the principal issues she addresses on appeal — that the Division's "hard cap" of seventeen hours of in-home behavioral services per week fails to comply with federal Medicaid requirements and also violates the ADA and Olmstead because it exposes her son to the risk of unnecessary institutionalization — until written summations, weeks after both parties had rested their cases. She contends, however, that, as to the Medicaid issue, her delay was caused by the State's failure to mention that the Division's services to her son are funded through Medicaid. She does not explain her delay in raising her claims under the ADA and Olmstead.

We have considered whether we can or should address the issues J.D. raises as to the Division's compliance with federal Medicaid requirements and the ADA under Olmstead. Appellate review, as the Supreme Court has again recently reminded, is "not unbounded." S.C. v. Dep't of Children & Families, ___ N.J. ___, ___ (May 27, 2020) slip op. at 59 n.10. We ordinarily will not consider an issue never explicitly advanced as a claim until after the OAL hearing concluded. In re Stream Encroachment Permit, Permit No. 0200-04-0002.1 FHA, 402 N.J. Super. 587, 602 (App. Div. 2008).

Critically, J.D.'s failure to raise the principal issues she asserts on appeal until after the parties' had put on their proofs has left the record insufficient

even to determine the plan's precise connection to Medicaid in the first instance, let alone whether it complied with federal law in challenged respects. We, nevertheless, deem the issues of significant public interest to warrant review. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Accordingly, we remand the matter to the Division for the development of an appropriate record sufficient to permit review of the issues raised on appeal.

Given our disposition, we limit our discussion of the facts and the issues. By way of brief background, petitioner and her husband became resource parents for their son K.D. when he was a year old. He suffered from fetal alcohol syndrome and had related minor developmental delays and some hyperactivity for which he received early intervention services. With those caveats, he seemed to be developing normally enough until four months after his third birthday, when, in the space of a week, he lost all language and communication skills, all self-help skills and the ability to interact or play. Doctors diagnosed him with Childhood Disintegrative Disorder, a condition falling at the most severe end of the autism spectrum.

K.D.'s dangerous behavior in the time that followed, including running away, self-injury, physical aggression, and pica — the ingestion of inedible matter — resulted in his hospitalization for six months. On his discharge in

February 2011, the Division of Developmental Disabilities (DDD) of the Department of Human Services afforded him access to in-home support services with a board-certified behavioral analyst as part of its Children's Placement Enhancement Pilot (CPEP) program. The Division maintains CPEP was a small program in DDD meant to fund services necessary to maintain stability in the home while a child awaited out-of-home placement. Since 2011, when K.D. was six years old, DDD began providing K.D. fifty-two hours a week of in-home behavior support services during those weeks the boy was in school and up to eighty-seven and one-half hours a week during school breaks and summer vacation.

The CPEP program ended in 2013 when the State moved all DDD services for children under twenty-one to the Division of Children and Families. The thirty-two children receiving services under the program were transferred to the Division's Children's System of Care (CSOC) in DCF. Over the next three years, the Division developed its own network of providers and programs, as well as a treatment model meant to be more clinically sound, efficient, and "sustainable" than that under CPEP, but in the interim maintained services for all children from the program, including K.D., at their existing levels.

For children on the autism spectrum, the Division developed its program using applied behavioral analysis methods for intervention, assigning higher need children such as K.D. to between fifteen and seventeen hours per week of in-home applied behavioral services and three hours per week with a board-certified behavior analyst.  The Division presented testimony at the hearing that the support services it provided were limited and meant only to supplement those already supplied by a child's school district.  Moreover, the Division maintained it was tasked with allocating finite resources among thousands of children with developmental disabilities in a fair and sustainable manner.  Although it endeavored to provide a level of support responsive to each child's needs, it could not offer more than what its treatment program permitted.  Nonetheless, the Division contended that families of children whose needs exceeded availability could still work with their care management organizations, private insurance, or Medicaid to obtain additional support services.

The Division advised the care management organizations responsible for administering the children's support services in spring 2015 that they would eventually need to "titrate" — that is, reduce — the children's support services to fit within the Division's program.  In spring 2016, the care management

A-3411-17T4

organizations were instructed to begin discussions with the children's families to negotiate titration plans to that end. The Division, however, imposed no specific deadlines or timeframes in order to allow the families flexibility. A representative of K.D.'s care management organization attempted to work out a gradual reduction in services in May or June 2016, but the family would not negotiate any change. In September 2016, the Division implemented a titration plan reducing K.D.'s services from fifty-two to thirty-seven hours per week.

The behavior analyst who had worked with K.D. since his release from the hospital in 2011, testified he benefited from the level of services previously afforded through DDD and required continuation of services at that level to effectively manage his behavior. Among his problematic behaviors she addressed during that time, with varying frequency, were self-injury, including hitting himself in the head with a closed fist; physical aggression toward others, including hitting, kicking, and biting; pica; breaking and throwing items; running away; climbing on furniture, windows, or railings; crying and throwing tantrums; and touching or attempting to climb into the oven.

A-3411-17T4

The analyst acknowledged that K.D. continued to engage in those behaviors in the family home and that, given his diagnosis of Childhood Disintegrative Disorder, his prognosis was poor. She maintained, however, that the services helped him manage those behaviors, and, that under CPEP, K.D. had slowly reacquired some skills, including learning to nod his head, engage in communication by "pecking symbols," and sometimes use the toilet. Based on data collected by the analyst and K.D.'s parents, however, K.D. had seen a significant increase in problematic behaviors since the Division imposed the titration plan with month-over-month increases of as much as 385 percent. The analyst testified that increasing K.D.'s services back to CPEP levels would allow him to continue to live safely at home with his family. She acknowledged, however, that, as K.D. got older — and stronger — his needs could become so great as to render home placement unfeasible.

J.D. filed an administrative appeal in 2016, challenging the reduced services reflected by the titration plan as insufficient to meet her son's needs. The matter was transferred to the OAL, which conducted a fair hearing over two days in 2017. Assignment of the burden of proof was a matter of dispute from the outset, but the parties agreed the Division would present its evidence

first, with the expectation the ALJ would ultimately assign the appropriate burden.

The parties submitted their written summations more than two months after the last hearing date, with J.D. raising for the first time the notion that K.D.'s treatment plan failed to comply with the Medicaid program and the ADA, 42 U.S.C.A. §§ 12101-12213 and Olmstead. The ALJ made no formal assignment of the burden of proof in his recommended decision, but generally accorded J.D.'s evidence greater attention and scrutiny and ultimately found, with little elaboration, that K.D.'s condition was extraordinarily severe to the point of perhaps not being amenable to adequate treatment with the resources respondent could make available. He concluded that K.D. should comply with respondent's titration program and explicitly contemplated, if titration proved unfeasible, that K.D. might not qualify for further benefits and may need to be considered for out-of-home placement. The ALJ did not address J.D.'s arguments as to Medicaid or the ADA, even to reject them as untimely raised.

J.D. timely filed exceptions, again raising an issue as to the appropriate assignment of the burden of proof and arguing the initial decision was contrary both to the record and to Medicaid requirements and the ADA. The Commissioner Designate of DCF issued a final agency decision in February

9

2018, adopting the ALJ's initial decision and affirming the Division's implementation of the titration plan, without any explicit acknowledgement of J.D.'s arguments as to the burden of proof, Medicaid, or the ADA.

On appeal, J.D. argues, in addition to maintaining the decision was not supported by the record, that the agency's decision was unreasonable because the titration plan violated federal Medicaid requirements because it imposed a hard limit on behavioral services, rather than tailoring the plan to his individual needs, and that the plan violated the ADA by exposing her son to the risk of unnecessary institutionalization. As already noted, the record is inadequate to permit us to resolve either claim.

Medicaid is a federally established but state-run program, Estate of F.K. v. Div. of Med. Assistance & Health Servs., 374 N.J. Super. 126, 134 (App. Div. 2005), that "provide[s] medical assistance" at public expense "to individuals 'whose income and resources are insufficient to meet the cost of necessary medical services,'" N.M. v. Div. of Med. Assistance & Health Servs., 405 N.J. Super. 353, 359 (App. Div. 2009) (quoting 42 U.S.C.A. § 1396). Participation is voluntary, but each participating state must comply with all federal statutory and regulatory requirements, Mistrick v. Div. of Med. Assistance & Health Servs., 154 N.J. 158, 166 (1998), and must adopt and

adhere to a plan establishing the scope of its program and setting forth reasonable standards for administration, Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 502 (1990).  Federal approval of such a plan permits the state to receive matching federal funds for applicable medical services reimbursed through the program.  42 U.S.C.A. § 1396b.

As pertinent here, each participating state must provide "early and periodic screening, diagnostic, and treatment services" (EPSDT) for all eligible minors under the age of twenty-one, 42 U.S.C.A. § 1396d(a)(4)(B), along with "[s]uch other . . . health care, diagnostic services, treatment, and other measures" that are "necessary . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State" plan for adults, § 1396d(r)(5).  Each covered service "must be sufficient in amount, duration, and scope to reasonably achieve its purpose," although the state agency responsible for the Medicaid program "may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures."  42 C.F.R. § 440.230.

In that connection, federal guidance explains that EPSDT services must be provided only if "medically necessary," elaborating:

11

The determination of whether a service is medically necessary for an individual child must be made on a case-by-case basis, taking into account the particular needs of the child. The state (or the managed care entity as delegated by the state) should consider the child's long-term needs, not just what is required to address the immediate situation. The state should also consider all aspects of a child's needs, including nutritional, social development, and mental health and substance use disorders. . . .

[U.S. Dep't of Health & Human Servs., EPSDT – A Guide for States, at 23 (June 2014) (emphasis added), https://www.medicaid.gov/sites/default/files/2019-12/epsdt_coverage_guide.pdf.]

However, to the extent such services qualify as medically necessary for a particular child, they must be covered irrespective of budgetary constraints:

Because medical necessity decisions are individualized, flat limits or hard limits based on a monetary cap or budgetary constraints are not consistent with EPSDT requirements. States may adopt a definition of medical necessity that places tentative limits on services pending an individualized determination by the state, or that limits a treating provider's discretion, as a utilization control, but additional services must be provided if determined to be medically necessary for an individual child. For example, while a state may place in its State Plan a limit of a certain number of physical therapy visits per year for individuals age 21 and older, such a "hard" limit could not be applied to children. A state could impose a "soft" limit of a certain number of physical therapy visits annually for children, but if it were to be determined in an individual child's case, upon review, that additional physical therapy services were

12

medically necessary to correct or ameliorate a diagnosed condition, those services would have to be covered.

[Id. at 23-24.]

J.D.'s position is that the behavioral services the Division affords to K.D. qualify as mandatory EPSDT services, which the State is "or should be" funding through Medicaid under the terms of New Jersey's Medicaid waiver plan (emphasis added). The Division, she argues, must therefore adhere to federal requirements prohibiting imposition of any hard limits on those services. It would thus follow that the reduction of care in K.D.'s titration plan was improper, because it was made pursuant to a hard limit of fifteen to seventeen hours per week, rather an individualized determination of his medical needs.

The problem is that J.D. cannot assert with confidence that the State funds the services it provides her son through Medicaid. The Division's regulations contemplate its funding may come from Medicaid, but not necessarily so:

An applicant who is deemed eligible to receive functional services from the CSOC shall, as a condition of continuing eligibility, apply for all benefits, including, but not limited to, Medicaid, NJ Family Care and any other State or Federal benefits for which he or she may be eligible and comply with

13

the requirements for continuing eligibility if found eligible.  The CSOC does not provide services that are available through other sources.

   1. Notwithstanding the requirement to apply for benefits as set forth in this subsection, denial of an application for benefits does not constitute grounds for finding an individual ineligible for functional services from the CSOC.

[N.J.A.C. 3A:40-2.1(b).]

Further, although J.D. is correct that the behavioral services the Division makes available to children with "serious emotional disturbance" such as K.D. are listed in New Jersey's Medicaid waiver, the federal Centers for Medicare & Medicaid Services, as the Division points out, have approved that waiver through June 2022 with the Division's existing program limits, the implication being that those limits are not inherently problematic.  NJ FamilyCare (NJFC) Comprehensive Demonstration before Ctrs. for Medicare & Medicaid Servs., Special Terms and Conditions at 1, 30-31 (Aug. 2017) (amended July 25, 2019), https://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Waivers/1115/downloads/nj/nj-1115-request-ca.pdf.  Indeed, the very statute establishing the agency and its implementing regulations explicitly contemplates a limitation of services based on availability:

   Notwithstanding any law, rule, or regulation to the contrary, . . . the Division of Children's System of

14

Care in the Department of Children and Families shall determine eligibility and provide support and services, deemed clinically and functionally appropriate by the Department of Children and Families, as limited by service availability and appropriations and other monies available, and to become available, for persons with developmental disabilities . . . under 21 years of age. . . .

[N.J.S.A. 30:4C-4.4(a); see also N.J.A.C. 3A:40-1.1(b) (providing that "[t]he availability of services shall be limited to the CSOC's funding in a given fiscal year").]

Moreover, even assuming the sort of services K.D. receives nonetheless qualify as EPSDT services, it does not follow that they also qualify as "medically necessary" for K.D. Pursuant to the above legal framework and our Department of Human Services' regulations, determinations of medical necessity are fact-specific to each individual and, particularly in the case of a minor, are sensitive to the individual's long-term needs and functional capacity:

"Medically necessary services" means services . . . necessary to prevent, diagnose, correct, prevent the worsening of, alleviate, ameliorate, or cure a physical or mental illness or condition; . . . to promote the development or maintenance of maximal functioning capacity in performing daily activities, taking into account both the functional capacity of the individual and those functional capacities that are appropriate to individuals of the same age; to prevent or treat a condition that threatens to cause or aggravate a

15

handicap or cause physical deformity or malfunction, and there is no other equally effective, more conservative or substantially less costly course of treatment available or suitable for the enrollee. The services provided, as well as the treatment, the type of provider and the setting, are reflective of the level of services that can be safely provided, are consistent with the diagnosis of the condition and appropriate to the specific medical needs of the enrollee and not solely for the convenience of the enrollee or provider of service and in accordance with standards of good medical practice and generally recognized by the medical scientific community as effective.

In the case of pediatric enrollees, this definition applies, with the additional criteria that the services, including those found to be needed by a child as a result of a comprehensive screening visit or an interperiodic encounter, whether or not they are ordinarily covered services for all other Medicaid/NJ FamilyCare enrollees, are appropriate for the age and health status of the individual and that the service will aid the overall physical and mental growth and development of the individual and the service will assist in achieving or maintaining functional capacity.

[N.J.A.C. 10:74-1.4.]

Because it is not clear on this record whether the services provided to K.D. by the Division are funded by Medicaid, whether they are implicated by the State's most recent Comprehensive Medicaid Waiver, and, if subject to federal Medicaid requirements, whether they are "medically necessary," in light of his

16

long-term needs and functional capacity, we cannot resolve the issue of whether the Division's titration plan complies with law.

We are similarly unable to resolve J.D.'s claim that the Division's decision was unreasonable on the ground that its titration plan failed to comply with the ADA, specifically by exposing her son to the risk of unnecessary institutionalization. As with her Medicaid argument, J.D. undisputedly failed to raise any issue as to the ADA in a timely manner. She offers no excuse for the delay.

J.D. relies for her position that respondent's plan conflicts with the ADA on Olmstead, 527 U.S. at 587, 597, where the Court concluded that placement of a person with mental disabilities in institutional care could constitute illegal "discrimination based on disability," if community placement was feasible and appropriate. Yet the Court concomitantly recognized "the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities" and their "obligation to administer services with an even hand." Id. at 597. In light of those obligations, it held that community-based treatment would be required only "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated,

taking into account the resources available to the State and the needs of others with mental disabilities." Id. at 607 (emphasis added).

J.D. argues on appeal that implementation of the Division's titration plan put K.D. at serious risk of institutionalization, pointing to the ALJ's conclusion that, if the plan proved unsuccessful, alternative services such as out-of-home placement might be required. She maintains the only evidence in the record as to the adequacy of K.D.'s treatment showed that the level of services previously afforded to him through DDD were sufficient to manage his behavior. J.D. acknowledges the "integration mandate under Olmstead [wa]s not absolute," but faults the Division for failing to present any evidence at the hearing to show that this limitation of benefits did not run afoul of that mandate.

The problem, of course, is that J.D. never raised the issue in time to put the Division on notice it would have to present any such evidence. As such, the record is inadequate to permit review of her claim under the ADA.

Because we have determined a remand is necessary for the development of the record, we do not address J.D.'s remaining arguments as to the allocation of the burden of proof or the sufficiency of the evidence to support the Commissioner's decision. We note this case was not argued. The hearing

18

before the ALJ took place three years ago. K.D. is now fifteen years old. His situation may well be different than what is was then. We do not presume the issues or arguments the parties will address at a new hearing.

Because the record developed before the ALJ is inadequate to determine whether the Division's plan is even subject to federal Medicaid law, and, if so, whether the services the Division provides K.D. are "medically necessary," in light of his long-term needs and functional capacity, as well as whether the Division's titration plan put K.D. at serious risk of institutionalization, in violation of the ADA, and whether that claim is even cognizable in the OAL, and because we think the issues of sufficient public interest, we remand the matter to the Division for the development of an appropriate record sufficient to permit resolution of the issues raised on appeal. We do not retain jurisdiction.

Vacated and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19                                                          A-3411-17T4